Milton .FALKOFF and Jeannette L. Falkoff, Appellants-Cross-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee-Cross-Appellant.

Nos. 78–1728, 78–1729.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1979.

Decided Aug. 30, 1979.

Bryon S. Miller and Alan L. Reinstein, Chicago, Ill., for appellants-cross-appellees.

William A. Friedlander, Tax Div., Dept. of Justice, Washington, D. C., for appellee-cross-appellant.

Before PELL and WOOD, Circuit Judges, and KIRKLAND, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The taxpayers, Milton and Jeannette Falkoff, appeal from the Tax Court's judgment against them for unpaid taxes for the calendar year 1969. The subject matter of the litigation is a complex series of financial transactions between a partnership doing business as Henry Crown and Company, Not Incorporated (hereinafter referred to as the Partnership), in which the taxpayers held a beneficial interest, Henry Crown and Company, an Illinois corporation (hereinafter referred to as the Corporation), all of whose outstanding stock is owned by the Partnership, the First National Bank of Chicago, and a number of wholly-owned subsidiaries of the Corporation. The financial transactions giving rise to this litigation are not the only aspects of this case which are complex. The framing of the issues raised on appeal and their resolution has been considerably complicated by the briefs for the Commissioner. In his opening brief the Commissioner devoted a good third of his argument advancing a position which he abandoned in his reply. His response to the taxpayer's appeal has been premised on an assumed factual finding which the Tax Court did not make. See note 4 infra. We have concluded after careful examination of the Tax Court's opinion, the record, and the applicable law that the Tax Court's judgment is without foundation in law or in fact. Consequently, we reverse and remand for further proceedings consistent with this opinion.

## I.

The facts as found by the Tax Court are set out in its memorandum opinion reported at 36 Tax Ct.Mem.Dec. 417 (1977). They are repeated here in lesser detail to assist understanding of the contentions of the parties.

The Partnership is a cash basis taxpayer using the calendar year as its taxable year. The Corporation and its subsidiaries file consolidated returns on an accrual basis using the period ending September 30 as their taxable year. Prior to the end of the Corporation's 1969 tax year and the series of transactions which attracted the Commissioner's attention here, the Partnership held the Corporation's note for $7.5 million as a

* Judge Alfred Y. Kirkland of the Northern District of Illinois sat on this case at the time of oral argument by designation. On May 1, 1979, Judge Kirkland became a senior district judge of the Northern District of Illinois and is continuing to sit on this case by redesignation.

result of prior transactions not relevant to our decision. The Partnership, in turn, was indebted to the First National Bank for $15.9 million—a debt evidenced by several promissory notes and secured by the pledge of miscellaneous securities. The Corporation's wholly-owned subsidiary, Exchange Building Corporation, owned a parcel of substantially appreciated land in California known as the San Ramon Ranch. Henry Crown and Company, the Corporation, had no accrued or current earnings and profits in its 1969 fiscal year.

For several months prior to September 30, 1969, Exchange had been negotiating for the sale of the San Ramon Ranch. Although no agreement of sale had been finalized as of the end of September 1969, the parties had reached, the Tax Court found, "agreement in principle." The Court also found that in anticipation of the sale the Partnership developed a plan

> to use the cash which would be received by Exchange from the sale of the San Ramon Ranch to reduce the indebtedness of the partnership to the First National Bank. The distribution of such proceeds by Exchange to Henry Crown and Company and, in turn, by the corporation to the partnership would have given rise to a taxable dividend to the extent of the earnings and profits of Henry Crown and Company, which would have reflected the distribution from Exchange. Instead, the partnership adopted a plan, intended to achieve the same result, without the distribution to the partnership being taxable as dividend. First, the indebtedness of the partnership to the First National Bank in the amount of $15.5 million would be repaid in advance of the sale from the proceeds of a loan of $18 million by the bank to Henry Crown and Company. Thereafter, in the subsequent fiscal year of the corporation, the new loan would be repaid, in part, through funds obtained from the corporation and its subsidiaries, including Exchange.

36 Tax Ct.Mem.Dec. at 422.

The scheme was executed as planned. On September 29, 1969, the Bank loaned $18 million to the Corporation. The Corporation, in turn, retired its $7.5 million note held by the Partnership and, in addition, distributed $10 million as a return of capital to the Partnership. With these funds the Partnership retired the bulk of its debt obligation to the Bank. In the following fiscal year, on October 1 or 2, 1969, the San Ramon sale was closed. On October 3, Exchange "loaned" the Corporation $10 million. On the same day, the Corporation used the proceeds of the loan to reduce the principal on the loan it had taken out from the Bank just a few days before. Miscellaneous other financial transactions between the Corporation and its subsidiaries occurred during the 1970 fiscal year which provided the Corporation with additional funds enabling it to further pay down the bank loan.

## II.

The Partnership regarded the distributions made to it by the Corporation on September 29, 1969, as a debt repayment to the extent of $7.5 million and a return of capital to the extent of $10 million, and it reported no taxable income from the transaction. The Commissioner challenged this characterization and before the Tax Court argued that the events of late September and early October, 1969, were no more than steps in a single overall transaction. The transaction, the Commissioner argued, was not completed earlier than October 3, 1969 —during the Corporation's 1970 fiscal year. Contending that during its 1970 tax year, the Corporation did receive earnings and profits, the Commissioner argued that the distributions to the Partnership should be regarded as dividends and therefore taxable to that entity as income in its 1969 taxable year.

The Tax Court rejected, at least in part, the Commissioner's step transaction approach. Relying on *Gross v. Commissioner,* 23 T.C. 756 (1955), *aff'd,* 236 F.2d 612 (2d Cir. 1956), and *Wilson v. Commissioner,* 25 T.C. 1058 (1956), the court noted that "Henry Crown had every right to pay a dividend [*sic ?*] out of borrowed funds in the taxable

year ending September 30, 1969, in anticipation of the realization of a gain which would cover the distribution in the subsequent year."[1] The court, however, declared that there was an exception to the *Gross* rule: If "the stockholders themselves provide the funds through a bank loan, the distribution may lack both business purpose and economic substance." 36 Tax Ct.Mem. Dec. at 422.[2] The Tax Court's analysis of the facts concerning the September 29, 1969, transaction between the Bank, the Corporation, and the Partnership led it to conclude that the debt restructuring fell within the exception to the *Gross* rule.

■ There is ample reason to suppose that one purpose of the transaction was to avoid taxes and that there was little, if any, valid business purpose for the Corporation taking out the $18 million loan.[3] Nevertheless, we are unable to conclude, as did the Tax Court, that the funds for the distribution were obtained from the Partnership-shareholder and that the transaction therefore lacked economic substance. The taxpayer's purpose to avoid taxation alone does not provide a sufficient basis for reshaping the transaction to change its tax repercussions.

■ The Tax Court found that the Bank was unconcerned about which entity—the Corporation or the Partnership—was personally liable on the debt. It thus regarded as without economic or tax significance the discharge of the Partnership's liability to the Bank and its substitution by the liability of the Corporation.[4] Instead stressed the importance of the underlying collateral, not personal liability. The court also made it plain that it regarded the $18 million loan to the Corporation as no different than "a *nonrecourse* loan to the partnership" (emphasis added). It noted, in its opinion, "the substitution of the indebtedness" from one entity to the other had no practical effect.

Moreover, there is no evidence in the record suggesting that the Partnership was liable for the $18 million loan taken out by the Corporation. The note evidencing the loan was signed only on behalf of the Corporation; the Partnership name does not appear on the note as a co-maker, endorser, or guarantor. The memorandum of the bank official who approved the $18 million loan makes it clear that the Bank appreciated that the transaction would shift liability for the debt from the Partnership to the Corporation. The chairman of the Bank testified to the same effect before the Tax Court. The Commissioner speculates that oral negotiations or a general understanding between the parties may have established their agreement that the Partnership would be liable for the $18 million debt. However, the Tax Court did not so find and no evidence in the record supports such a conclusion. The stipulation of facts simply states that the Partnership was indebted to the Bank for $15.9 million prior to September 29 and for approximately $1 million after that date. It does not mention any Partnership liability, primary or otherwise, for the Corporation's indebtedness. The fact that the Partnership's stock in the Corporation was pledged to secure the loan does not by itself permit the inference that the Partnership was liable to the Bank for the repayment of the $18 million. *See Edenfield v. Commissioner,* 19 T.C. 14 (1952).

---

1. The Commissioner apparently concedes as much in its brief. The brief describes the Second Circuit's opinion affirming *Gross* as holding "that a corporation may utilize borrowings to pay a dividend out of realized appreciation."

2. The Court cited *Waterman Steamship Corp. v. Commissioner,* 430 F.2d 1185 (5th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971), for this proposition. Although *Waterman* was decided on facts dissimilar to the present case, we accept the above rule as a specific application of the doctrine that the substance of a transaction, rather than its form, determines the transaction's tax consequences. *But see Shield Co. v. Commissioner,* 2 T.C. 763 (1943) (taxpayer unable to persuade the court to ignore a distribution by corporation to its controlling shareholder that was financed by a loan from the taxpayer-shareholder).

3. During oral argument, the taxpayers suggested that the purpose of the loan was to obtain "leverage." But, as the Commissioner has noted, since the bulk of the loan was repaid within just a few days, even if leverage is a valid business purpose, the Tax Court was justified in finding that it was not the purpose for the loan in question here.

4. The Commissioner's briefs have proceeded on the theory that the Tax Court found that the Partnership, after the loan transactions on September 29, 1969, was either primarily or secondarily liable on the $18 million loan. Although the Tax Court's opinion is not crystal clear, we believe a fair reading of it does not support the Commissioner's conclusion that the Partnership was in any way *personally* liable for the Corporation's $18 million debt. The court

the court found that the Bank relied primarily on the value of the collateral pledged to secure the $18 million loan. Since the Partnership's stock in the Corporation as well as the Corporation's shares in its subsidiaries secured the $18 million loan, the Court found that the Bank made the loan not upon the faith and credit of the Corporation, but on the collateral pledged by the Partnership.[5] After examining the record, we believe that the Tax Court's conclusion that the loan was made on the strength of the assets pledged by the Partnership and that this made the Partnership in effect the borrower is clearly erroneous.[6]

The court's own findings of fact provide:

The loan was secured by a pledge of certain assets belonging to either the partnership or Henry Crown and Company, including all of the issued and outstanding stock of Henry Crown and Company. First National Bank valued the pledged collateral at $30,213,365, consisting of the following:

| Shares | Corporation | Value |
|---|---|---|
| 25,000 s/s | Henry Crown and Company ) | |
| 10 s/s | Thomas B. Bishop Co.       ) | $ 6,414,000 |
| 100 s/s | The Park-Grey Corp.        ) | |
| 500 s/s | Arrowhead Venture, Inc. | 6,000,000 |
| 6,000 s/s | The LaSalle Corp. | 1,453,123 |
| 400 s/s | Mascar Corp. | 808,017 |
| 50,000 s/s | Exchange Bldg. Corp. | 15,600,000 |
| 5,000 s/s | Lindrick Service Corp. | 33,688 |
| 5,000 s/s | Lindrick Corp. | 5,000 |
| 1,000 s/s | Mile 300 Company | 99,537 |
| 200 s/s | DPV Corporation | 300,000 |
| | | $30,213,365 |

36 Tax Ct.Mem.Dec. at 419 [7] It is clear from the stipulation of the parties that all the pledged stocks belonged to the Corporation except, of course, the shares in the Corporation itself.[8] The appraised value of the Henry Crown and Company stock listed

---

5. It is clear that the First National Bank did not, in fact, make a loan of $18 million to Henry Crown and Company upon the faith and credit of that corporation. The loan was secured, not only by the stock of subsidiaries owned by Henry Crown and Company, but also by the stock of that corporation itself, which was an asset of the partnership. A corporate borrower cannot pledge its own stock as collateral. Other collateral securing the loan also was not a part of the assets of Henry Crown and Company. As a practical matter, the First National Bank apparently cared little who was the borrower of record. The collateral remained the same. The First National bank was lending on the "Crown" line of credit.[4]

   4 Mr. Gaylord Freeman, former chairman of the First National Bank, testified that First National regarded all of the Crown enterprises as one complex for loan purposes. Mr. Freeman additionally testified that the Crown complex had a line of credit of approximately $50 million and the collateral for any particular Crown loan would generally be considered collateral for any other Crown loans.

   In effect, the loan of $18 million to Henry Crown and Company was no different than a nonrecourse loan to the partnership with the stock of that corporation and its underlying assets as collateral.
   36 Tax Ct.Mem.Dec. at 422 & n.4.

6. The clearly erroneous standard governs our review of findings of fact of the Tax Court. 26 U.S.C. § 7482(a) (Court of Appeals shall review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions without a jury"); Fed.R. Civ.P. 52(a). *See generally* Rice, *Law, Fact,*

*and Taxes: Review of Tax Court Decisions Under Section 1141 of the Internal Revenue Code,* 51 Colum.L.Rev. 439 (1951). That standard governs not only our review of findings resolving contested issues of fact, but also our review of the inferences which the Tax Court drew from documents or undisputed facts. *United States v. United States Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Millsap v. Commissioner,* 387 F.2d 420 (8th Cir. 1968). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Gypsum,* 333 U.S. at 395, 68 S.Ct. at 542.

7. Since the Bank relied on the book value of the stocks when no appraised value was available, it is quite likely that this estimate of the value of the collateral underestimates its true worth. A revenue agent's 1969 report estimated the value of the Corporation and its subsidiaries, for example, as more than $46 million, net of all liabilities.

8. The Tax Court's opinion, *see* note 5 *supra,* states that in addition to the Partnership's shares in Henry Crown and Company, "[o]ther collateral securing the loan also was not a part of the assets of Henry Crown and Company." The court also asserted that the collateral which had secured the Partnership's notes to the Bank was also used as security for the Corporation's note to the Bank. The record, however, contains no support for either of these two conclusions.

   The Tax Court presumably based its finding that other collateral secured the loan on the

above did not include the value of the stock of its subsidiaries. Thus, of collateral valued at over $30 million, only approximately $6 million was directly pledged by the Partnership. In other words, the Corporation directly put up approximately 80% of the collateral which constituted roughly 130% of the amount of the loan. As to the collateral which the Partnership admittedly did put up to secure the Corporation's loan, *i. e.,* the stock in the Corporation itself, the taxpayers maintain that the pledge of a shareholder's stock to secure a corporation's indebtedness is a common commercial practice which avoids the need for a multitude of complex mortgages and UCC filings covering the corporation's underlying assets. Although the existence of such a custom is a question of fact which we ordinarily would not rely on absent findings by the trier of fact, since here we explore the economic reality of the transaction, it is sufficient to note that the pledge of the Partnership's stock in the Corporation merely reflected value which inhered in the Corporation's underlying assets anyway. It did not change the substance of the transaction into one in which the Bank looked to the credit of the Partnership in making the loan. Given the relatively small increase in the value of the collateral which the pledge of the stock added to that already pledged by the Corporation and the fact that the pledge only accomplished indirectly what could have been done directly by mortgaging the underlying assets of the Company, we cannot agree with the Tax Court that the Bank did not make the loan upon the faith and credit of the Corporation.

The transaction, viewed as a whole, did have economic substance. The Corporation retired a debt owed to the Partnership in the amount of $7.5 million. The $10 million distribution reduced the Corporation's net worth by $10 million. Although it may have been a matter of indifference to the Bank who the debtor was as long as the debt was adequately secured, the liability of the parties on an obligation often makes a difference for purposes of taxation. *Cf. Frank Lyons Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). That the Bank may have regarded the Corporation and the Partnership as parts of a single entity does not require that they be so treated for tax purposes. We cannot conclude that this is a case where the shareholder provided funds enabling the corporation to make a sham distribution back to the shareholder. Instead, this is a case where a corporation without accrued or present earnings and profits borrowed against its own appreciated assets and made a distribution in anticipation of future profits. As the Tax Court itself recognized, such a distribution does not result in taxable income to the shareholder.

### III.

In any event, even if we were to agree with the Tax Court that the loan transactions were shams, we would still conclude that the relevant taxable event occurred on September 29, 1969, not during the Corporation's 1970 fiscal year. Since it

testimony of Mr. Gaylord Freeman. Mr. Freeman's testimony about his bank's dealings with the Crown complex, however, simply provides no basis for inferring that the $18 million loan to the Corporation was secured by other Partnership properties not owned by the Corporation. Mr. Freeman did testify that the Bank's notes contained cross-collateralization provisions, but he also noted that "I'd have to say that I am sure there would be some assets of some of the companies that we couldn't have used on other companies. . . ." The provisions of all the notes at issue here merely provide that any collateral of the maker of the note would secure "any other liabilities and obligations" of the maker to the holder of the

note. Since, so far as the record shows, the Partnership had no obligation to the Bank on the $18 million note, *see* note 4 *supra,* its properties used to secure its indebtedness to the Bank could not serve as collateral securing the obligation that the $18 million note evidenced. Similarly, the court's conclusion that the same collateral secured the obligations of the Partnership and the Corporation is sheer speculation. The Commissioner contends that the court's conclusion is not clearly erroneous because the $18 million note of the Corporation and the notes of the Partnership all described the collateral as "Sundry Securities." This contention is without merit.

is conceded that the Corporation had no earnings and profits in its 1969 fiscal year, no taxable income would be due in any event.

The Tax Court, after holding the $18 million loan to be an indebtedness incurred solely for the benefit of the shareholder, held that the distribution should be deemed to have occurred when the Corporation repaid the loan. The court cited, in support of its holding, *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947). In *Wall* the court noted:

> It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. . . . The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt.

*Id.* at 464. What was deemed to have happened in *Wall,* is essentially what happened here. The Corporation paid the money to the Partnership, which in turn retired its debt with the Bank. Thus, the taxable event occurred during the Corporation's 1969 fiscal year.

■ The Commissioner, in an attempt to justify deferring the time of the distribution until the repayment of the $18 million loan, cites *Maher v. Commissioner*, 469 F.2d 225 (8th Cir. 1972). In *Maher*, a controlled corporation assumed the taxpayer-shareholder's debt, but the taxpayer remained secondarily liable on the indebtedness. The

Eighth Circuit reasoned that under those circumstances, the economic benefit to the taxpayer from the corporation's assumption of the debt was too speculative to warrant taxation until the corporation actually made payments on the debt. In the present case, the Partnership was not personally liable for the Corporation's debt. *See* note 4 *supra*.[9] The distribution of the $17.5 million which was used to discharge the Partnership's liability to the Bank yielded a substantial economic benefit to the Partnership which was capable of reasonable valuation at that time. Treating the transaction as it occurred, we hold the distribution occurred for tax purposes when it did in fact. *Cf. Jewell v. United States*, 330 F.2d 761, 763–64 (9th Cir. 1964).

■ The Commissioner, of course, has argued that to reverse the Tax Court's judgment would permit taxpayers to determine for themselves the time and manner of taxation, in frustration of Congressional directive and with prejudice to the federal fisc. We think our decision here will have no such dire consequence. Congress in enacting the revenue code adopted the annual accounting concept and permitted the wholly-owned corporation to be treated as an entity separate from the shareholder. We believe the taxpayers here did no more than use these characteristics of the tax system to their best advantage. The situation here is an unusual one—a corporation without accrued or current earnings and profits but with substantial assets against which it can borrow to make a cash distribution to its shareholders. Yet, even here the effect is only to delay, not escape, taxation. A distribution reduces a shareholder's basis in his shares and thereby increases taxable gain upon disposition of the stock. The Corpora-

---

9. The Commissioner apparently regards the continuing personal liability of the shareholder as the critical fact in *Maher*. *See* Rev.Rul. 77–360, 1977–2 C.B. 86. Although in some cases the *Maher* rule may apply where substantial assets of the shareholder remain pledged to secure the debt even though the shareholder has technically been released from personal liability, *cf. Maher*, 469 F.2d at 229 ("[t]he underlying theory of a realization of income under these circumstances is freeing of the debtor's assets from liability for the debt"), here the only property the stockholder used to secure the debt was its stock in the corporation. Under the circumstances of this case, we do not believe that the Partnership's stake in having the Corporation's debt repaid was sufficiently great to defer the time of the distribution for tax purposes. *See Cox v. Commissioner*, 56 T.C. 1270, 1280–81 (1971), *modified on other grounds*, 58 T.C. 105 (1972).

**1052**

tion's future earnings and profits will be taxed as dividends when distributed.

Our decision here obviates the need to consider whether the several transactions between the Corporation and its subsidiaries which are the subjects of the remainder of the appellants' appeal and the Commissioner's cross-appeal resulted in taxable income to the Corporation during its 1970 fiscal year. That part of the Tax Court opinion characterizing these transactions is therefore vacated so as not to bind the taxpayers or the Commissioner in the future. Since we hold that the distribution occurred in the Corporation's 1969 tax year when the Corporation had no earnings and profits, the distribution apparently lowers the Partnership's basis in the stock, *see* I.R.C. § 301(c)(2), and, to the extent it exceeds the basis, is treated as gain upon the sale or exchange of property, *id.* (c)(3)(A). From the record, it is not clear whether or not the $10 million distribution exceeded the Partnership's basis in the Corporation's stock. The case is, therefore, remanded for a determination of the Partnership's basis in the stock at the time of the distribution.

Reversed and Remanded.