T.C. Memo. 2018-121

UNITED STATES TAX COURT

ILLINOIS TOOL WORKS INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10418-14.                    Filed August 6, 2018.

<u>Caroline H. Ngo</u>, <u>Thomas Kevin Spencer</u>, <u>Kathryn C. Vouri</u>, and <u>Justin E. Jesse</u>, for petitioner.

<u>H. Barton Thomas, Jr.</u>, <u>Justin D. Scheid</u>, <u>Mindy Y. Chou</u>, and <u>John P. Healy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2006, the Internal Revenue Service (IRS or respondent) determined a deficiency of

[*2] $70,174,594. In his answer respondent asserted that petitioner is also liable for an accuracy-related penalty of $14,034,919 under section 6662(a).[1]

In September 2006 the worldwide group headed by Illinois Tool Works Inc. (ITW or petitioner) had on its balance sheet about $618 million of cash, held mostly by European affiliates. ITW desired to bring a portion of this cash back to the United States. To do so, it employed a plan that combined intercompany debt with a return-of-capital distribution.

This repatriation plan worked as follows. One of petitioner's lower-tier controlled foreign corporations (CFCs) lent money to an upper-tier CFC. The upper-tier CFC was a holding company with no current or accumulated earnings and profits (E&P). The upper-tier CFC then distributed the loan proceeds of $356,778,000 to one of petitioner's domestic subsidiaries, which reported the distribution as a nontaxable return of capital.

The IRS attacked this strategy on two grounds. First, it contended that the loan between the CFCs was actually a dividend. If that were so, the E&P of the lower-tier CFC would move to the upper-tier CFC, and the distribution by the upper-tier CFC would be taxable as a dividend under section 301(c)(1). Second, if

---

[1]All statutory references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[\*3]** the form of the intercompany loan were respected, the IRS contended that the domestic parent had insufficient basis in the upper-tier CFC to absorb the distribution as a return of capital. If that were so, a portion of the distribution would be taxable as capital gain under section 301(c)(3).

There are four principal issues that we must decide: (1) whether the loan from the lower-tier CFC to the upper-tier CFC should be treated as bona fide debt; (2) if we find the loan to be bona fide debt, whether it should nevertheless be recharacterized, under one or more judicial anti-tax-avoidance doctrines, as a dividend to the upper-tier CFC or to petitioner; (3) if the loan is not recharacterized as a dividend, whether the domestic parent had sufficient basis in the upper-tier CFC to treat the entirety of the distribution as a return of capital; and (4) whether petitioner is liable for an accuracy-related penalty. We resolve all issues in petitioner's favor.

## FINDINGS OF FACT

The parties filed stipulations of facts with attached exhibits and stipulations of settled issues, all of which are incorporated by this reference. ITW is a publicly held C corporation founded in 1912. It had its principal office and principal place of business in Illinois when it filed its petition.

**[*4] A.** <u>Company Background and Ownership Structure</u>

ITW is the parent of a group of more than 100 companies that manufacture industrial products and equipment. Petitioner and its domestic subsidiaries have filed consolidated Federal income tax returns at all relevant times. During 2006 petitioner's foreign subsidiaries did business in 49 countries. We will refer to these companies collectively as the ITW Group.

In 2006 the ITW Group had operating revenue of about $14.1 billion and net income of $1.7 billion. It divided its business operations into four segments: (1) engineering products (North America); (2) engineering products (international); (3) specialty systems (North America); and (4) speciality systems (international). It had about 55,000 employees in that year.

Between 1999 and 2008 petitioner pursued a strategy of growth through acquisitions. To raise cash for these acquisitions and for a $447 million stock buyback in August 2006, petitioner substantially increased its short-term debt. Its outstanding commercial paper (CP) obligations, which stood at $20 million in June 2006, grew to $770 million by December 2006.

During 2006 petitioner was the sole shareholder of ITW International Holdings, Inc. (InHold), a Delaware corporation. (In July 2007 InHold changed its name to ITW Global Investments, Inc.) InHold in turn was the sole shareholder of

[*5] Paradym Investments Ltd. (Paradym), which was originally organized in Bermuda. In August 2005 Paradym became a domestic corporation and a member of petitioner's consolidated group.

During 2006 Paradym was the sole shareholder of CS (Europe) Holdings, Ltd. (CSE), a Bermuda corporation with its registered office in Bermuda. Petitioner formed CSE in 2001 as part of a project to place the ITW Group's European subsidiaries under several tiers of foreign holding companies. CSE, situated at the top of this structure, is what some commentators have described as a "super holding company."[2]

In 2006 CSE was the sole shareholder of Miller Insurance, Ltd. (Miller), a captive insurance company, and CS (Australasia) Holdings, Ltd. (CSA), both Bermuda corporations. CSA, like CSE, was a holding company with no active business operations.[3] Directly and indirectly CSA held stock in about 100 foreign operating companies, including the following: (1) ITW Group France; (2) Illinois

---

[2]See Alan W. Granwell, "News Analysis: Contract Manufacturing Arrangements and Subpart F," 119 Tax Notes 381 (2008); Bret Wells, "What Corporate Inversions Teach About International Tax Reform," 59 Tax Notes Int'l 221 (2010).

[3]Petitioner formed CSA in 2001 as part of a restructuring of its Australian and Asian subsidiaries to achieve (among other things) Australian tax benefits. Petitioner later contributed CSA to CSE as part of a separate project designed to achieve (among other things) U.K. and U.S. tax benefits.

[*6] Tool Works Nederland B.V.; (3) ITW (Deutschland) GmbH; (4) ITW Italy Holding S.r.l. (Italy Holding); and (5) ITW Belgium S.p.r.l.  We will refer to these five operating companies collectively as the European Borrowers.  Italy Holding was the sole shareholder of several Italian subsidiaries and disregarded entities, including Italy Finance Srl (Italy Finance).

At all relevant times CSE and CSA were CFCs within the meaning of section 957(a).  Petitioner, InHold, and Paradym were U.S. shareholders of these CFCs under section 951(b) because they owned (directly or indirectly) 100% of the total combined voting power of all classes of the CFCs' stock.  The parties have stipulated that CSA had the following amounts of E&P for its fiscal years ending (FYE) November 30, 2006 and 2007:

| FYE Nov. 30 | Current E&P | Accumulated E&P |
|---|---|---|
| 2006 | $306,339,452 | $749,554,212 |
| 2007 | 319,317,329 | 1,043,397,544 |

In 2004 Congress enacted a "tax holiday" that enabled U.S. shareholders of CFCs to enjoy a reduced tax rate of 5.25% on dividends received from their foreign affiliates.  American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 422(a), 118 Stat. at 1514-1515.  To take advantage of this tax holiday, petitioner caused CSA and other affiliates to pay substantial dividends to CSE, which in turn

[*7] paid substantial dividends to Paradym. During its FYE November 30, 2005, CSE paid Paradym dividends of $825,054,144, and during its FYE November 30, 2006, CSE paid Paradym dividends of $160,540,400. Petitioner reported all of these dividends on the relevant Forms 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations. As of November 30, 2006, CSE had no remaining E&P.[4]

B.      Cash Pool

Most borrowing by the European members of the ITW Group was done by holding companies using bank lines of credit. Within each country the operating companies would maintain funds in operating accounts. Any excess positive balance (i.e., amounts above what was needed for current operations) would be swept into the holding company within that country and aggregated with the excess positive balances of the other operating companies. When it needed to borrow, the holding company would draw on a line of credit with a local bank and transfer the loan proceeds into that country's cash pool.

Beginning in 2001 the ITW Group used a "notional" cash pool operated by Bank Mendes Gans N.V. (BMG), a Dutch bank. In a "notional" cash pool, one

---

[4]From 2002 through 2012, CSA paid CSE more than $2.2 billion of dividends including the $985,594,544 ($825,054,144 + $160,540,400) referred to in the text.

**[*8]** participant (called the cash pool "header") calculates a consolidated net position by offsetting the cash surpluses against the cash deficits of the various participants. Unlike a "zero balance" cash pool, in which offsets are implemented by actual transfers of cash, a "notional" cash pool involves no physical movement of money between participants' accounts.

About 50 members of the ITW Group participated in the BMG cash pool during 2006. CSA and CSE joined the cash pool in November 2006 using the U.S. dollar as their functional currency. The cash pool was managed by an ITW finance officer in the United States, whose duties included approving wire transfers and investing funds. The cash pool operated as follows:

- An entity depositing money into the cash pool would receive deposit credit on its separate BMG account.

- An entity withdrawing money from the cash pool would show a corresponding debit on its separate BMG account.

- An entity could withdraw more funds from the cash pool than it had deposited, provided the overall cash pool balance was positive.

- Any cash pool account with a credit balance would receive interest from BMG, and any cash pool account with a debit balance would be charged interest by BMG. BMG determined interest rates daily by reference to market rates for the applicable country's currency.

- Cash pool accounts with credit balances were pledged as security for accounts with debit balances.

**[\*9]** • ITW provided a $75 million guaranty to be fulfilled in the event one or more participants in the cash pool defaulted.

BMG offered "netting" services in connection with this notional cash pool. This enabled payments and receipts between participating entities to be offset. After calculating the net amount due to or from each participant, BMG credited or debited that participant's cash pool account accordingly.

C. Repatriation Planning

Petitioner's Capital Solutions Group (Capital Solutions) was responsible for all tax planning, tax advice, and tax compliance during 2006. In September 2006 Capital Solutions began planning a repatriation of funds from petitioner's CFCs to facilitate the retirement of outstanding CP and to fund new acquisitions. Its first step was to create a schedule titled "Cash Available for Repatriation," which compiled excess funds held by CSE and its subsidiaries as of September 30, 2006.

Numerous individuals assisted with planning the repatriation, including: (1) Allan Sutherland, petitioner's senior vice president, who also served as president and a director of CSE and CSA; (2) Lisa Hampton, manager of strategic tax planning and project manager for the repatriation transaction; (3) Felix L. Rodriguez, Jr., petitioner's treasurer, who also served as vice president and a director of CSE and CSA; and (4) Ronald Kropp, petitioner's senior vice president and chief

[*10] financial officer.  At all relevant times, Mr. Sutherland and Mr. Rodriguez signed documents on behalf of CSA and CSE in their capacities as directors.

On October 31, 2006, Ms. Hampton informed Mr. Sutherland that the European affiliates had substantial positive balances in the BMG cash pool that could be used to fund part of a repatriation from CSE.  Petitioner also considered having CSE borrow from third-party banks or capital markets to fund the repatriation.  But in a follow-up email on November 7, 2006, Ms. Hampton informed Mr. Sutherland that CSE did not have audited financial statements, which would have been necessary for a bank borrowing unless petitioner agreed to guarantee the loan.  Because petitioner did not wish to guarantee such a large loan, and because there was insufficient time before the end of the year to secure audited financials, Mr. Sutherland decided that the best course of action was for CSE to secure an intercompany loan.  Petitioner desired to complete the repatriation before year-end 2006 in order to pay down its outstanding CP.

On December 6, 2006, Mr. Sutherland and Ms. Hampton discussed the terms for a loan from CSA to CSE.  After considering prevailing market rates for similar intercompany debt, they decided upon 6% as the appropriate interest rate and five years as the appropriate term.  In selecting these loan terms, they also compared the cost of intercompany borrowing by the CFCs with interest rates on

[*11] short-term CP borrowing by petitioner. Lending funds to CSE would require CSA temporarily to "go negative" in the cash pool and pay interest on its debit balance at 5.875%.

Sometime in early December 2006 Ms. Hampton prepared a plan for executing the repatriation, which was summarized in a Tax Planning Project Approval Form (TPPAF). This document noted that petitioner had been "borrowing on short term CP" to fund its domestic acquisitions and that the European subsidiaries had excess cash. It explained that petitioner would cause certain of its foreign subsidiaries to borrow from their local banks, deposit the proceeds into the BMG cash pool, and have CSA borrow from the pool to fund a loan to CSE, which would distribute the loan proceeds to Paradym. The TPPAF noted that "for US tax purposes the distribution is being treated as return of capital and is not taxable." The TPPAF projected that the proposed repatriation strategy would yield tax savings of about $47 million for the ITW Group.

Mr. Kropp presented the TPPAF to petitioner's board of directors on December 8, 2006. He explained that combining an intercompany loan to CSE with a distribution of the loan proceeds as a return of capital would be the most tax-efficient method of repatriating funds. Mr. Kropp also presented a proposal to "in-

[*12] crease guarantees for European borrowings" in connection with the repatriation. The board approved the TPPAF and Mr. Kropp's proposal.

D.    Repatriation Transactions

Petitioner's repatriation plan proceeded as follows:

• Between November 30 and December 4, Italy Holding and its subsidiaries executed a series of transactions designed to enable them to lend to the other European Borrowers while maintaining their ability to deduct interest on indebtedness under Italy's recently enacted "thin capitalization" rules. These transactions culminated in a $95 million loan from Italy Finance to a European affiliate, which BMG deducted from Italy Holding's cash pool account and credited to CSE's cash pool account.[5]

• Between December 11 and 13, the European Borrowers secured from local banks loans of $140 million, of which $125 million was from new short-term credit facilities and $15 million was from existing facilities. Petitioner guaranteed the borrowing for the new credit facilities.

• Between December 13 and 15, the European Borrowers deposited the loan proceeds described above into the BMG cash pool. They concurrently liqui-

---

[5]This loan, which had a five-year term, was later extended twice. The loan was repaid in full (with interest) on August 30, 2012.

[*13] dated $155 million of money market funds and deposited the proceeds into the BMG cash pool.

- On December 13 Mr. Sutherland and Mr. Rodriguez, acting in their capacities as officers and directors of CSE and CSA, authorized CSE to borrow $356,778,000 from CSA. This loan was documented in a one-page promissory note that provided for 6% simple interest and a five-year repayment term (2006 note). No principal payments were due until maturity, and there was no premium or penalty for early repayment. The note stipulated that CSA could enforce payment of principal and interest, made no provision for subordinating the debt to CSE's other obligations, and stated that Delaware law would govern its interpretation. CSA recorded this note on its books as an intercompany note receivable, and CSE recorded it as an intercompany note payable.

- Mr. Sutherland and Mr. Rodriguez concurrently authorized the distribution of the $356,778,000 loan proceeds from CSE to Paradym. To avoid multiple currency conversions, they directed CSE to transfer this amount directly to InHold, Paradym's parent.

- On December 15 the euro equivalent of $356,778,000 was transferred from CSA's cash pool account at BMG to CSE's cash pool account. This caused

[*14] CSA temporarily to have a negative cash pool balance of $356,778,000, which accrued interest at 5.875% annually.

• Later that day BMG transferred $356,778,000 from CSE's cash pool account to InHold's bank account in the United States. Petitioner used these funds to pay down its outstanding CP balance, which was reduced from approximately $726.9 million on December 1 to about $200.7 million on December 31.

E.    Repayment of the CSE Note

During 2007-2011 petitioner considered a variety of options for repaying the CSE note, including third-party borrowing, intercompany borrowing, and the issuance of capital market debt or equity instruments. In late 2008 the IRS began examining petitioner's 2006 and 2007 tax returns, focusing chiefly on the repatriation transaction, and petitioner subsequently filed a protest with the IRS Appeals Office. In December 2011, when the CSE note was due to mature, petitioner's case was still pending with the Appeals Office.

Petitioner believed that it would be inadvisable to repay the CSE note while the Appeals Office was considering its 2006 tax liability. Petitioner accordingly decided that CSA and CSE should extend for one year the maturity of the existing loan. On December 15, 2011, CSE executed a new one-year promissory note for $356,778,000, the outstanding principal balance of the 2006 note.

**[\*15]** The 2011 note provided that CSE would pay interest at the 90-day LIBOR rate plus 20 basis points, to be reset quarterly.[6] Like the 2006 note, the 2011 note made no provision for subordinating the debt to CSE's other obligations. It stipulated that principal and interest were due at maturity, that there was no premium or penalty for early repayment, and that CSA could enforce payment of principal and interest. The new loan was recorded on the books of both companies as an intercompany note for $356,778,000.

In June 2012 CSE borrowed $15 million from Miller and received a dividend of $15 million from it. In November 2012 CSE used this $30 million to repay part of the principal on the 2011 note, reducing the outstanding balance to $326,778,000. As of November 2012 the IRS Appeals Office had not concluded its review of the repatriation transaction, and petitioner decided upon another one-year extension of the maturity date.

On December 14, 2012, CSA and CSE executed a new one-year promissory note for $326,778,000. The terms of 2012 note were identical to those of the 2011

---

[6]LIBOR (London Interbank Offering Rate) is an average interest rate that major international banks charge each other for large loans. It is considered one of the primary benchmarks for short-term interest rates worldwide, and it was the short-term rate at which petitioner itself could borrow. Using LIBOR as a baseline rate, petitioner added 20 basis points to account for CSE's position as a subsidiary within the ITW Group.

[*16] note, except that the interest rate was set at 90-day LIBOR plus 50 basis points, to be reset quarterly. CSA and CSE recorded the new loan on their books as an intercompany note for $326,778,000.

During 2012-2013 petitioner divested itself of certain businesses, generating substantial cash that could be used to reduce debt. On December 15, 2013, In-Hold's board authorized the contribution of $344,411,130 to Paradym, which made (through a subsidiary) a capital contribution of the same amount to CSE. That same day, CSE paid $329,324,880 to CSA, representing full payment of the principal balance on the 2012 note plus accrued interest for 2013. After making this payment, CSE had a debit balance in the BMG cash pool of $46,410,496.

The 2006, 2011, and 2012 notes did not mandate periodic interest payments, permitting both principal and interest to be paid at maturity. However, CSE and CSA reported annually on their books the payment and receipt of interest in the following amounts:[7]

---

[7]Interest on the 2011 and 2012 notes was keyed to the 90-day LIBOR rate, which stayed below 1% during those years. See David Hou & David Skeie, Fed. Reserve Bank of N.Y., Staff Report No. 667, LIBOR: Origins, Economics, Crisis, Scandal, and Reform 5 (2014). Thus, the interest CSE paid during 2012 and 2013 was substantially less than the interest it paid on the 2006 note, which bore simple interest of 6%.

[*17]

| Fiscal year | Amount |
|---|---|
| 2007 | $20,514,735 |
| 2008 | 21,406,680 |
| 2009 | 21,406,680 |
| 2010 | 21,406,680 |
| 2010 (short year) | 1,783,890 |
| 2011 | 20,455,272 |
| 2011 (short year) | 124,005 |
| 2012 | 2,255,266 |
| 2012 (short year) | 72,927 |
| 2013 | 2,546,880 |

On the dates on which CSE reported payment of this interest, it had (before paying the interest) a debit balance in the BMG cash pool or a credit balance smaller than the amount of interest paid, as follows:

| Date | CSE cash pool balance |
|---|---|
| 11/21/2007 | $15,484 |
| 11/26/2008 | (20,128,199) |
| 11/25/2009 | (7,520,210) |
| 11/24/2010 | 1,800,340 |
| 12/22/2011 | (21,053,997) |
| 11/29/2012 | (13,660,028) |
| 12/20/2012 | (43,670,457) |

Besides the CSE loan, petitioner's books on December 31, 2006, showed 122 other outstanding intercompany debts with an aggregate face amount of $74.5

[*18] billion.  In response to respondent's discovery requests, petitioner provided information for a representative sample of 48 intercompany loans.  Of these loans, 33 were fully repaid or settled via intercompany transfer, 12 remained outstanding, 2 were extinguished upon merger of the lender and borrower, and 1 was divested when petitioner sold both entities to a third party.

F.     Financial and Tax Reporting

At all relevant times petitioner and its domestic subsidiaries, including In-Hold and Paradym, used the calendar year for tax and financial reporting purposes.  During 2006-2010 most of petitioner's foreign subsidiaries reported using an FYE November 30.[8]  Petitioner filed Forms 5471 as required for all tax years, reporting each CFC's balance sheet, income and expenses, and transactions with related entities.  Petitioner reported all relevant information about the 2006 repatriation on its 2006 return.  Because CSA and CSE used an FYE November 30, information regarding the December 2006 repatriation was reported on their Forms 5471 for FYE November 30, 2007.

To prepare its consolidated financial statements, petitioner used Hyperion, an accounting software program, and then "mapped" these accounts into CorpTax,

---

[8]Using an FYE November 30 allowed petitioner's accounting personnel to close out the foreign subsidiaries' books before the end of petitioner's taxable year, which made it easier to produce consolidated financial statements.

[*19] its tax accounting software. "Mapping" the accounts involved a two-step process by which the trial balances were first reviewed for accuracy and then linked to specified accounts in CorpTax.

The 2006 CSE note was reported in petitioner's Hyperion trial balance for 2006 as a $356,778,000 "Intercompany Note Payable" to CSA. CSE's Form 5471 for FYE November 30, 2007, shows on line 15 of Schedule F current liabilities of $356,807,169, which includes its indebtedness to CSA. The interest payment on the 2006 note is reflected in the Hyperion trial balance on line I-43 (Intercompany Interest), and the detail indicates that this interest was paid to CSA. CSE's Form 5471 for FYE November 30, 2007, shows the interest payment on line 5 of Schedule C (Income Statement). Petitioner used a similar process to report the promissory notes and interest payments on CSA's books and Forms 5471 for FYE November 30, 2007, and subsequent years.

G.    IRS Examination

Petitioner timely filed Form 1120, U.S. Corporation Income Tax Return, for 2006. It attached to its Form 1120 pro forma returns for InHold and Paradym. Neither of these pro forma returns reported as income the $356,778,000 distribution from CSE because petitioner treated it as a return of capital to Paradym.

[*20] The IRS selected petitioner's return for examination and determined that the December 2006 repatriation was taxable. The IRS first determined that the transfer from CSA to CSE was a dividend rather than a loan; that E&P of $356,778,000 had thus "tiered up" to CSE; and that CSE's distribution to Paradym was therefore taxable as a dividend under sections 301(c)(1) and 316. Alternatively, the IRS determined that petitioner had failed to substantiate Paradym's basis in CSE, so that the distribution, if not a dividend, was not a tax-free return of capital under section 301(c)(2) but rather was taxable capital gain under section 301(c)(3).

The IRS issued a timely notice of deficiency setting forth these adjustments, and petitioner timely petitioned this Court for redetermination. In his answer respondent asserted an accuracy-related penalty under section 6662(a). In an amended answer respondent attacked the repatriation transaction on two alternative theories: (1) that the loan from CSA to CSE should be recharacterized as a dividend under judicial anti-tax-avoidance doctrines and (2) that the transaction was in substance a loan from CSA directly to petitioner or Paradym, generating a taxable investment in U.S. property under section 956(a) and (c)(1).

**[*21] H.    Expert Testimony**[9]

    1.    Robert C. Grien

Respondent offered, and the Court recognized, Robert C. Grien as an expert in debt capital markets. He evaluated the terms of the 2006 note and opined that it would not have been salable to a third party without substantial modifications. He pointed out that the note did not contain restrictive covenants typically found in publicly issued, investment-grade debt instruments, such as restrictions on investment activities, restrictions on payment of dividends, and negative pledges of assets. For that reason, he opined that a third party would have been unwilling to extend credit to CSE on the terms set forth in the 2006 note.

Mr. Grien also observed that the 2006 note: (1) was not guaranteed by petitioner; (2) did not explicitly mandate periodic payment of interest; and (3) was in his view "structurally subordinated" to debts of CSA's operating subsidiaries. Mr. Grien opined that the 2006 note, to be marketable to an independent investor, would need to include, at a minimum, provisions mandating interest payments at fixed times, acceleration of principal upon default or bankruptcy, and a restriction

---

[9]An alphabetical listing of petitioner's and respondent's expert witnesses, together with a short résumé of each, appears in the appendix beginning infra p. 74.

[*22] against mergers. While noting the absence of truly comparable companies, he opined that CSE's credit rating would be at most BBB+.

2. R. Glenn Hubbard

Respondent offered, and the Court recognized, R. Glenn Hubbard as an expert in corporate finance and economics. Evaluating the "economic reality" of the repatriation transaction, he opined that it lacked a valid business purpose. Specifically, he concluded that there was no business reason for CSA to lend money to CSE to enable it to make a distribution to Paradym.

Dr. Hubbard also opined that CSE lacked an independent ability to repay CSA. From an economic perspective, he believed, funds for repayment could only come from CSA itself (via distributions to CSE) or from petitioner or its domestic subsidiaries (none of which had guaranteed the note). And he observed that CSE made its interest payments to CSA by borrowing money from the BMG cash pool, which in his view represented a circular flow of funds.

3. Saul Froomkin

Petitioner offered, and the Court recognized, Saul Froomkin as an expert in Bermuda commercial law. He opined that the 2006 note was enforceable under Bermuda law; that CSA's directors would violate their fiduciary duties under Bermuda law if they sought to prevent CSA from enforcing repayment of the note;

**[*23]** and that Mr. Sutherland and Mr. Rodriguez, as directors of CSA, would be personally liable to it if they did not enforce repayment of the note. He also opined that CSE's obligation to repay CSA was not subordinated to CSE's obligations to third-party creditors.

4.     Israel Shaked

Petitioner offered, and the Court recognized, Israel Shaked as an expert in corporate finance. Dr. Shaked considered whether CSE could have obtained financing from a third party. In his expert report he performed three analyses: (1) a debt service analysis, which considers whether a borrower has sufficient cashflow to make future principal and interest payments; (2) an equity cushion analysis, which considers the amount by which the value of the borrower's assets exceeds its indebtedness; and (3) a capital adequacy analysis, which considers the borrower's leverage compared to industry benchmarks.

Applying these analyses, Dr. Shaked concluded that CSE and its subsidiaries would have been expected to generate sufficient cash between 2007-2011 to make payments on all of their outstanding debts when they became due. He specifically found that: (1) CSE was projected to have free cashflow of about $1.5 billion during 2007-2011, more than enough to discharge all its debts; (2) CSE would not require additional debt financing to repay the CSA loan; and (3) CSE's equity

[*24] cushion was at least $6 billion.[10]  He concluded that CSE was adequately capitalized and had substantial unused debt capacity.[11]  And whereas CSE's peer companies had debt-to-equity ratios between 19% and 31%, Dr. Shaked calculated that CSE's debt-to-equity ratio ranged between 4% and 6%.[12]  In a rebuttal report he concluded that Dr. Hubbard had erred in opining:  (1) that CSE lacked an independent ability to repay the loan and (2) that CSA in effect had created a liability to itself, on the theory that its funds were a likely source of repayment.

5.    William Chambers

Petitioner offered, and the Court recognized, William Chambers as an expert in assignment of credit ratings.  In his report Dr. Chambers stated that he would likely have assigned CSE, each time it executed a note in favor of CSA, an investment grade rating of at least BBB+ under the Standard and Poor's (S&P) credit rating system.  He based this conclusion on CSE's strong cashflow and low debt levels:  Debt represented only 0.1% of CSE's capital structure before the

---

[10]Dr. Shaked found that for 2011 (the year in which the 2006 note matured) the CSE group had an equity cushion of about $7.4 billion.

[11]As of December 15, 2006, the assets of CSE and its subsidiaries exceeded their liabilities by approximately $6.1 billion.

[12]The debt-to-capital ratio was 6% when the 2006 note was issued and 4% in 2011 when it matured.

[*25] 2006 note was issued and peaked at only 3.7% of capital in 2008. Dr. Chambers further opined that: (1) CSE had at least a "satisfactory business risk profile" in 2006; (2) CSE's profit margins were relatively steady in 2006 and subsequently; and (3) although CSE's debt was "structurally subordinated," this fact was irrelevant because CSA had very little outstanding debt (CSA's consolidated indebtedness peaked at $251.6 million in 2009 and decreased to $17.1 million in 2012).

6.      Charles Chigas

Petitioner offered, and the Court recognized, Charles Chigas as an expert in debt capital markets. In his report Mr. Chigas opined that a third-party investor would have purchased the 2006 note on substantially similar terms. He based his opinion on the following conclusions: (1) CSE's strong credit profile supported an S&P credit rating of at least BBB; (2) the financial terms of the 2006 note were substantially similar to standard investment grade terms; and (3) CSE's ratio of debt to EBITDA (earnings before interest, taxes, depreciation, and amortization) was extremely low.

Mr. Chigas observed that the note lacked restrictive nonfinancial covenants but opined that this was typical of investment grade debt. While acknowledging that CSE's ability to defer interest payments until maturity was atypical of invest-

**[\*26]** ment grade debt, he opined that an upward adjustment of 5 to 10 basis points would be sufficient to account for that fact. Finally, Mr. Chigas noted that the corporate bond market was extremely strong in 2006, which would have made CSE's loan attractive to investors.[13]

## OPINION

### I.  Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent generally bears the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses" pleaded in the answer or in an amended answer. Rule 142(a)(1). Because we decide all factual issues on a preponderance of the evidence, we need not decide who has the burden of proof. See sec. 7491(a); Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).

---

[13]Petitioner also offered as an expert witness Todd Miller, who prepared a study to calculate Paradym's basis in CSE. We have decided to treat Mr. Miller as a summary witness rather than an expert witness. See infra pp. 65-69.

**[*27]** II.     CSE Note

    A.     Bona Fide Debt

Petitioner contends that the loan from CSA to CSE constituted bona fide debt that was used to fund a tax-free return-of-capital distribution from CSE to Paradym. Respondent contends that the loan was not bona fide debt, that the funds transferred from CSA to CSE constituted a disguised dividend, that CSE was required to increase its E&P under section 312 by the amount of this dividend, and that the subsequent distribution from CSE to Paradym was a taxable dividend under sections 316(a) and 301(c)(1).

Whether an advance of funds is treated as genuine debt "must be considered in the context of the overall transaction." Hardman v. United States, 827 F.2d 1409, 1411 (9th Cir. 1987). Our inquiry typically focuses on whether the taxpayer intended to create a debt with a reasonable expectation of repayment and (if so) whether that intent comports with creating a debtor-creditor relationship. Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). The key to this determination is the taxpayer's actual intent. Bauer v. Commissioner, 748 F.2d 1365, 1367-1368 (9th Cir. 1984), rev'g T.C. Memo. 1983-120; A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333-1334 (9th Cir. 1970).

**[*28]** Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Seventh Circuit. That court has held that "[w]hether withdrawals by a shareholder from a corporation are treated for tax purposes as loans or dividends turns on whether, at the time of the withdrawals, the taxpayer intended to repay them." Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), aff'g T.C. Memo. 1983-98. In determining whether the taxpayer intended to repay the withdrawals, the Seventh Circuit considers objective factors as indicative of intent but regards no single factor as dispositive. Ibid.; see also Frierdich v. Commissioner, 925 F.2d 180, 182-183 (7th Cir. 1991), aff'g T.C. Memo. 1989-393. This determination is "purely a question of fact." Busch, 728 F.2d at 949. "[O]nce the taxpayer's intent is found, that finding is conclusive of the legal issue of loans versus dividends." Ibid.

We will apply the factors the Seventh Circuit mentioned in Busch. We will supplement that analysis with discussion of factors listed in Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980), to the extent the Seventh Circuit has suggested (by citing opinions from this Court or other courts) that such additional factors merit discussion. In applying these factors we recognize, as the Seventh Circuit recognized in Busch, 728 F.2d at 951, that there can be "especially strong support" for finding corporate advances to be dividends where the purported bor-

[*29] rower is the sole shareholder of the purported lender.  This sole-shareholder scenario creates "obvious difficulties to thinking of the shareholder and corporation as debtor and creditor."  Ibid. (quoting Alterman Foods, Inc. v. United States, 611 F.2d 866, 869-870 (Ct. Cl. 1979)); see also Kraft Foods Co. v. Commissioner, 232 F.2d 118, 123-124 (2d Cir. 1956) (noting that an arrangement is subject to "close scrutiny by the Commissioner" where it is "made between a parent corporation and its wholly-owned subsidiary"), rev'g 21 T.C. 513 (1954).

We will consider in our analysis the following factors from Busch:  (1) the taxpayer's statement of intent to repay; (2) the extent of the shareholder's control of the corporation; (3) the retained earnings and dividend history of the corporation; (4) the size of the transfer; (5) the presence of conventional indicia of debt, such as a promissory note, collateral, and interest charges; (6) the treatment of advances in corporate records; (7) the history of repayment; and (8) the taxpayer's use of the funds.  We will also consider the following factors from Dixie Dairies: (9) participation in management as a result of advancing funds; (10) the status of the advances in relation to regular corporate creditors; (11) "thinness" of the capital structure; (12) the risk involved in making the advances; (13) the identity of interest between the creditor and the shareholder; and (14) the ability to obtain loans from outside sources.  Dixie Dairies, 74 T.C. at 493; see Fin Hay Realty Co.

[*30] v. United States, 398 F.2d 694, 697 (3d Cir. 1968) (noting that an advance may not be a bona fide loan if an outside lender would not have advanced funds on the same terms as did the corporate insider); Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-606 (1991); Shaw v. Commissioner, T.C. Memo. 2013-170, 106 T.C.M. (CCH) 54, 56 (noting that, in determining whether an advance of funds constitutes bona fide debt, "economic reality provides the touchstone"), aff'd, 623 F. App'x 467 (9th Cir. 2015).

### 1. Stated Intent to Repay

When analyzing intent we consider the parties' actual intent at the time the advances were made. See Busch, 728 F.2d at 949; A.R. Lantz Co., 424 F.2d at 1333; Spheeris v. Commissioner, 284 F.2d 928, 931 (7th Cir. 1960), aff'g T.C. Memo. 1959-225. Our aim is to determine whether the parties intended to create a "definite obligation, repayable in any event." See Hewlett-Packard Co. v. Commissioner, T.C. Memo. 2012-135, 103 T.C.M. (CCH) 1736, 1752, aff'd, 875 F.3d 494 (9th Cir. 2017). Intent is a factual issue that we decide on the basis of all the circumstances. See Busch, 728 F.2d at 949-950; United States v. Uneco, Inc. (In re Uneco, Inc.), 532 F.2d 1204, 1208 (8th Cir. 1976).

Petitioner's actions strongly suggest that it intended to create a bona fide debt. The 2006 note, evidencing the original advance, and the 2011 and 2012

[*31] notes, evidencing the refinanced advances, were legally binding documents. Each loan document was reviewed and approved by CSA's and CSE's board of directors before it was executed. The notes required payment of interest and repayment of principal at fixed maturity dates. Each year CSE made interest payments, which were properly recorded on its and CSA's books. CSE repaid the loan in full via cash transfers in 2012 and 2013.[14]

Although it may be challenging to prove intent to repay when the borrower is the sole shareholder of the lender, Busch, 728 F.2d at 951, the ITW Group has a good track record in this respect. At year-end 2006 ITW had on its books 122 other intercompany loans with an aggregate face amount of $74.5 billion. During discovery petitioner provided information for a representative sample of 48 such loans; of those, 33 were fully repaid, 3 were discharged in a merger or acquisition, and 12 remained outstanding. Petitioner's current and former employees credibly testified that ITW always followed a "live by the agreement" principle for repaying debt, including intercompany debt. This pattern suggests to us that petitioner regarded its intercompany loans as bona fide debts that were intended to be repaid and were in fact repaid.

---

[14]Although respondent contends that petitioner failed properly to record the advance, CSA recorded an asset and CSE recorded a liability in the amount of the loan in their corporate records and on their Forms 5471. See supra p. 19.

[*32] Respondent contends that petitioner's refinancing of the loan weighs against a finding of genuine indebtedness. We disagree. CSE clearly had the financial capacity to repay the loan at the original maturity date in December 2011. Because this case was then pending before IRS Appeals, petitioner believed it advisable to extend the maturity date. On these facts, we find that refinancing the loan casts no doubt on CSE's intent to repay. See Litton Bus. Sys., Inc., 61 T.C. at 380 n.9 ("We do not consider as particularly detrimental to petitioner's case the fact that payments of principal and interest were suspended when the Internal Revenue Service challenged the propriety of the debt."); Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. 451, 457 (1969) ("Refinancing * * * is an accepted business practice and we see nothing wrong with it if reasonable in the context of the particular facts[.]").

Respondent contends that CSE could have funded its distribution to Paradym in other ways, e.g., by "going negative" in the BMG cash pool or by borrowing in the credit markets. We do not see the logic of this argument. The fact that CSE might have secured other loans sheds no light on its intent to repay the loan it actually secured. The relevant question is whether, at the time CSA advanced funds, CSE intended to repay that debt in full. Because we find that CSE did evidence its intent to repay the debt, the first Busch factor favors petitioner.

**[\*33]**       2.       <u>Extent of Shareholder Control</u>

Dividend treatment may be indicated where a shareholder has "complete control over the corporate accounts," so that he has "no fear that the corporation would demand repayment." <u>See</u> <u>Busch</u>, 728 F.2d at 951.  CSE was the sole shareholder of CSA at all relevant times.  We accordingly find that the second <u>Busch</u> factor favors respondent.

Although this factor favors dividend treatment, we find that it carries somewhat less weight here.  In the <u>Busch</u> case the sole shareholder was an individual who extracted cash from his corporation and used that cash for his personal purposes.  ITW is a publicly traded company that, like many of its peers, had a substantial amount of intercompany debt on its consolidated financial statements.  In any multinational group such as this, the borrowing and lending entities will typically be related through common ownership by the ultimate parent.

Notwithstanding this common ownership, the record establishes that CSE and CSA took all steps required to create genuine indebtedness.  The promissory notes were legally binding documents.  Like the borrowers in the 122 other intercompany loans on ITW's books, CSE was required to fulfill its obligations to its creditors.  As Mr. Froomkin testified, CSA's directors (Mr. Sutherland and Mr. Rodriguez) had a fiduciary duty to demand repayment from CSE.  If they breached

**[\*34]** those duties, they would subject themselves to legal repercussions under Bermuda and U.S. law.  For these reasons, we find that the second <u>Busch</u> factor, while favoring respondent, weighs somewhat less heavily in the balance.

### 3.     Retained Earnings and Dividend History

If a corporation has substantial earnings over many years but pays no dividends, recurring loans to a shareholder may suggest dividend treatment.  <u>See</u> <u>Busch</u>, 728 F.2d at 950.  On the other hand, where a company pays regular dividends and adheres to formal requirements for both dividends and debt, loans to shareholders may properly be treated as debt where the advances are intended as such.  <u>See, e.g.</u>, <u>Page v. Haverty</u>, 129 F.2d 512, 514 (5th Cir. 1942).

CSA advanced funds to CSE in December 2006.  During the four preceding years and the six subsequent years, CSA paid CSE in the aggregate more than $2.2 billion of dividends.  The parties have stipulated that these dividends were recorded on both companies' books and Forms 5471 for all years.  CSA thus had a substantial dividend-paying history.

Respondent notes that CSA did not pay any dividends to CSE during 2006 in particular.  But we decline to draw a negative inference from this; many corporations do not pay dividends in every year of their existence.  The Seventh Circuit has directed us to consider the "dividend history of the corporation."  <u>Busch</u>, 728

[*35] F.2d at 948. We find that CSA's payment of $2.2 billion of dividends during the 10 years surrounding the year of the loan favors treating that advance as debt.

### 4. Size of the Advance

This factor overlaps with the "ability to repay" factor. As Dr. Shaked credibly testified, the $356,778,000 loan was not particularly large relative to CSE's equity cushion of $6 billion. CSE had ample cashflow from which to repay the loan. See infra pp. 39-42. We accordingly find that the fourth factor is neutral or favors petitioner slightly.

### 5. Conventional Indicia of Debt

In applying this factor we consider whether there exist formal indicia of debt, such as a promissory note, interest payments, a fixed maturity date, and a right to enforce repayment. Because CSA and CSE strictly adhered to all loan formalities, this fifth factor favors petitioner.

The issuance of a bond, debenture, or promissory note is generally required to establish the existence of bona fide indebtedness. See Hardman, 827 F.2d at 1412. Compliance with such formalities may be accorded less weight when the parties are related. See Fin Hay Realty Co., 398 F.2d at 697; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 286 (1990). But the note evidencing the CSE loan

[*36] was a legally binding debt instrument, and to that extent it supports debt treatment.

Both the original 2006 note and the two successor notes required payment of interest, at specified rates, upon maturity of the loan. CSE in fact paid all required interest on an annual basis. CSE and CSA recorded these payments on their books as interest on intercompany indebtedness.

Both the original 2006 note and the two successor notes specified definite dates for repayment of principal. "The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation." Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see Monon R.R. v. Commissioner, 55 T.C. 345, 359 (1970) ("[A] definite maturity date on which the principal falls due for payment, without reservation or condition, * * * is a fundamental characteristic of a debt.").

"The right to enforce the payment of interest is one of the requisites of a genuine indebtedness." Gokey Props., Inc. v Commissioner, 34 T.C. 829, 835 (1960), aff'd, 290 F.2d 870 (2d Cir. 1961). The right to enforce payment of principal upon maturity of the loan is likewise characteristic of true debt. Laidlaw Transp., Inc. v. Commissioner, T.C. Memo. 1998-232, 75 T.C.M. (CCH) 2598, 2619; see Kraft Foods Co., 232 F.2d at 122 (noting that an "unconditional obliga-

**[*37]** tion" to pay interest and principal are "necessary features of instruments of indebtedness").

Mr. Froomkin credibly testified that CSE's promissory notes to CSA were binding obligations under Bermuda law and that Bermuda law provided mechanisms by which CSA could enforce payment. He testified that CSA's and CSE's directors had separate fiduciary duties to each entity that required them to act in each entity's best interest. This suggests that CSA would exercise its right to enforce payment of interest and principal on the notes.

Respondent contends that CSA had no practical ability to enforce repayment because CSE had no operating assets. But companies often borrow against capital assets, including stock of their subsidiaries. As an intermediate holding company, CSE borrowed against the value represented by the stock of CSA and its numerous subsidiary operating companies.

Respondent's argument confuses the obligation to repay with the source of funds to be used for repayment. Like any holding company borrower, CSE had three possible sources of funds for repayment of the loan: earnings from lower-tier operating subsidiaries, capital contributions from its parent, or a third-party refinancing. The evidence established that CSA had the legal ability to enforce repayment under Bermuda law; how CSE might choose to fund the repayment is a

[*38] wholly separate question. We conclude that the CSE loan bore all conventional indicia of debt, including the creditor's ability to enforce payment of interest and principal. The fifth Busch factor thus favors petitioner.

### 6. Treatment of Advances in Corporate Records

Respondent agrees that CSA and CSE recorded the loan as debt on their books; that CSE reported the loan as a liability on its Forms 5471; and that both parties "generally treated the Note as debt on [their] financial records." Although the loan was shown as a liability on CSE's Form 5471 and as an asset on CSA's Form 5471, in neither case was it labeled a "loan to or from shareholders." This minor discrepancy does not support an inference that the note was a disguised dividend. See Alterman Foods, Inc., 611 F.2d at 868 (emphasizing that the advance in question was recorded as an asset on the subsidiary-lender's books and as a liability on the parent-borrower's books).

Respondent contends that petitioner did not adequately document the plan for repayment of the loan in December 2006 when CSE borrowed the funds. We know of no requirement that a borrower do this. When a homeowner takes out a mortgage loan with a five-year balloon, he may have no concrete plan for repaying the loan five years later. He may liquidate other assets to pay off the loan, he may refinance it, or he may sell the house. For present purposes, the relevant question

[*39] is whether the $356,778,000 loan was consistently treated as debt on CSA's and CSE's books.  Because it was, this sixth factor favors debt treatment.

### 7. Repayment History and Source

A borrower's ability to repay principal and interest out of projected cashflow supports debt characterization.  See NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172, 103 T.C.M. (CCH) 1916, 1921 (characterizing advance from parent to subsidiary as debt where subsidiary had sufficient cashflow to make all payments).  A borrower's timely payment of interest and principal, consistently with the terms of the underlying instrument, likewise supports debt treatment.  See PepsiCo Puerto Rico, Inc. v. Commissioner, T.C. Memo. 2012-269, 104 T.C.M. (CCH) 322, 339-340.

CSE's cashflow could easily satisfy its debt obligations.  As a holding company, CSE's projected cashflow consisted principally of earnings expected to be generated by its lower-tier operating subsidiaries.  Dr. Shaked testified that these subsidiaries were expected to generate during 2007-2011 at least $1.5 billion of free cash, and the record supports his testimony.  He concluded (and we agree) that CSE had potential debt capacity of at least $6 billion.  Thus, it could easily have secured third-party refinancing for the $356,778,000 loan if operating earnings ever fell short.

**[\*40]** CSE in fact made annual interest payments on the loan. The principal was originally due to be repaid in December 2011, but petitioner refinanced the loan twice while the IRS was auditing its 2006 return. As noted earlier, we do not think this refinancing casts any doubt on the transaction's debt status. CSE repaid $30 million of principal in late 2012 and repaid the remaining principal balance in full (together with accrued interest for 2013) in December 2013.

When making interest payments before maturity, CSE initially borrowed funds from the BMG cash pool. It later repaid those borrowings by depositing into the BMG cash pool dividends paid by the lower-tier operating companies. While acknowledging that CSE paid interest to CSA, respondent contends that these payments were "circular" because they were ultimately funded by dividends from CSA's subsidiaries.

We do not find this argument persuasive. As a holding company, CSE's projected cashflow would necessarily be expected to derive chiefly from the earnings of its lower-tier operating subsidiaries. Respondent appears to contend that a payment of interest should be respected as such only if it is funded by earnings from the debtor's own operations. This theory, if accepted, would appear to make a holding company incapable of incurring genuine intercompany debt. We are aware of no legal support for that theory. Cf. Al Goodman, Inc v. Commissioner,

**[*41]** 23 T.C. 288, 301-302 (1954) (respecting advance to sole shareholder as bona fide debt where shareholder pledged stock as security for loan and received a dividend to repay part of loan balance); NA Gen. P'Ship & Subs., 103 T.C.M. (CCH) at 1921 (respecting interest payments where debtor obtained a loan from a third party that was repaid with dividends from debtor's subsidiary).

In a related vein, respondent contends that CSE lacked "an independent ability to repay the loan" because the source of funds for repayment would have to come from CSE's lower-tier operating subsidiaries, ITW, or a third-party borrowing. But this will always be true for an intermediate holding company, and it does not mean that CSE lacked an ability to repay the loan. As Drs. Shaked and Chambers explained, any potential creditor would evaluate CSE's creditworthiness by taking into account the assets and future cashflows of its operating subsidiaries.[15] On the basis of these financial facts, petitioner's experts concluded that CSE would likely receive an S&P credit rating of BBB or BBB+, both of which are investment grade. With projected free cash of at least $1.5 billion from subsidiaries during 2007-2011 and potential debt capacity of at least $6 billion, CSE plainly had the ability to repay the $356,778,000 loan. It actually paid all interest

---

[15]Any potential creditor would also take into account the likelihood of support from ITW, CSE's highly profitable ultimate parent, as Dr. Chambers stated in his expert report.

**[*42]** and principal due on that loan. We find that the seventh factor favors debt treatment.[16]

### 8. Use of Advanced Funds

In <u>Busch</u>, 728 F.2d at 950, the Seventh Circuit affirmed this Court's holding that advances of corporate funds to a sole shareholder, an individual, were constructive dividends where the individual used those advances largely "for purely personal purposes." How funds are used may also be relevant in determining whether a particular investment constitutes debt or equity. Where a corporation uses a shareholder advance to acquire capital assets, the advance is more likely to be characterized as equity. <u>Estate of Mixon</u>, 464 F.2d at 410. Where such advances are used to meet the corporation's daily operating needs, debt treatment may be indicated. <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, 730

---

[16]Respondent contends that CSA had "an implied liability" to fund repayment of the loan because CSE, as a holding company, had no significant operating assets. In respondent's view, this created an off-the-books liability on CSA's part that precisely offset the asset represented by the CSE note, supposedly rendering the loan transaction circular. But CSA did not in fact have any liability (implied or otherwise) to fund CSE's repayment of the loan. CSE could have repaid the loan in at least two other ways: by receiving a capital contribution from ITW (as it in fact did) or by refinancing the loan with a third-party borrowing. Again, the upshot of respondent's argument is that an intermediate holding company cannot incur genuine intercompany indebtedness. We find no support in law or logic for that theory.

**[*43]** F.2d 634, 640 (11th Cir. 1984), aff'g T.C. Memo. 1982-314; Raymond v.

United States, 511 F.2d 185, 191 (6th Cir. 1975); Estate of Mixon, 464 F.2d at

410.

CSE used the $356,778,000 loan proceeds to make a return-of-capital distri-

bution to Paradym, and those funds were ultimately used to pay down petitioner's

CP balance. Respondent contends that this scenario is at odds with debt treatment

because the loan proceeds were not used in CSE's business. He analogizes this

case to cases in which purported loan proceeds were used for the shareholder's

individual purposes. See Busch, 728 F.2d at 950; Bergersen v. Commissioner,

T.C. Memo. 1995-424, 70 T.C.M. (CCH) 568, 586 (finding advance used for con-

struction of shareholder's residence to be a dividend), aff'd, 109 F.3d 56 (1st Cir.

1997).

It is not clear how the "use of funds" factor should be evaluated here. The

shareholder-debtor in this case is a corporation, not an individual, and corpora-

tions do not have "personal purposes." Nor is this a debt/equity case. One might

say that the immediate use of the lent funds--to make a corporate distribution--has

the feel of a dividend. But the ultimate use of the lent funds--to repay short-term

CP indebtedness--may suggest a back-to-back loan driven by operational business

[*44] necessities.  On balance, we conclude that this eighth factor is best regarded as neutral and in any event is not entitled to great weight.

### 9.  Participation in Management

This factor may be relevant in determining whether a taxpayer's advance to a corporation constitutes debt or equity.  If the advance entitles the taxpayer to participate in (or to a greater participation in) management of the company, the advance is more likely to be treated as equity.  See, e.g., Am. Offshore, Inc., 97 T.C. at 603.  But this is not a debt/equity case.  And the advance here was made to the shareholder, not by the shareholder.  CSA's advance could not entitle it to participate in the management of CSE, its parent corporation.  We accordingly find this factor unhelpful here.

### 10.  Status of Advances Relative to Other Debt

If a corporation advances funds to a shareholder, and if the corporation's right to repayment is subordinated to claims of the shareholder's other creditors, the argument may be weaker for characterizing the advance as true debt.  See, e.g., Estate of Mixon, 464 F.2d at 406; CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16, 89 T.C.M. (CCH) 701, 725.  Neither the 2006 note nor the 2011 and 2012 notes subordinated CSA's right to repayment to the rights of CSE's

**[*45]** other creditors.  Nor, as Mr. Froomkin testified, would Bermuda law require subordination by reason of CSA's being wholly owned by CSE.

Respondent notes that CSA's right to repayment was structurally subordinated to any debt (including trade debt) of CSA's operating subsidiaries.  "With holding companies," however, "any debt issued is necessarily subordinated to the creditors of its operating company."  NA Gen. P'Ship & Subs., 103 T.C.M. (CCH) at 1921.  Since this type of subordination arises automatically, it has little relevance in assessing whether the parties intended to create genuine indebtedness that CSE would repay.  See ibid. (noting that structural subordination in these circumstances "is to be expected and does not in and of itself cast doubt on the legitimacy of debt issued by a holding company").  Structural subordination would be relevant, not in assessing CSE's intent to repay the loan, but in determining whether the creditors of CSA's operating subsidiaries would stand first in line to access the subsidiaries' assets if the assets were sought to be used as a source of repayment.

In any event, as Dr. Chambers and Mr. Chigas noted, CSA and its operating subsidiaries had very low debt levels during the relevant period.  CSA's consolidated indebtedness peaked at $251.6 million in 2009 and decreased to $17.1 million in 2012.  Given that the operating subsidiaries had projected free cashflows of at least $1.5 billion during 2007-2011, structural subordination would not mean-

[*46] ingfully impact the likelihood of CSA's getting repaid.  We find that this factor supports debt characterization.

### 11.    Adequacy of Capitalization

The purpose of examining the borrower's debt-to-equity ratio is to determine whether it is so thinly capitalized as to make questionable its ability to repay. CMA Consol., Inc., 89 T.C.M. (CCH) at 725.  If a corporation is too thinly capitalized, a purported loan may be recharacterized as a dividend or as an equity investment.  See, e.g., In re Larson, 862 F.2d 112, 117 (7th Cir. 1988); Bauer, 748 F.2d at 1369; Hubert Enters., Inc. v. Commissioner, 125 T.C. 72, 96-97 (2005), aff'd in part, vacated in part and remanded on other grounds, 230 F. App'x 526 (6th Cir. 2007).

CSE was strongly capitalized between 2006 and 2012.  Dr. Shaked noted that, as of December 15, 2006, the assets of CSE and its subsidiaries exceeded their total liabilities by roughly $6.1 billion.  CSE's debt-to-capital ratio, taking the CSA loan into account, was 6% at that time.  This ratio, which was lower than the debt-to-capital ratios of all but one of the companies that Dr. Shaked regarded as CSE's peers, indicates very robust capitalization.  Dr. Shaked reached the same conclusion about CSE's capital structure in 2011, when the five-year note matured.  At that point the CSE group had an equity cushion of about $7.4 billion and a

[*47] debt-to-capital ratio of around 4%. Because CSE was very far from thinly capitalized, this factor supports debt treatment.

### 12. Risk Involved in Making Advances

In applying this factor we consider "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." Gilbert v. Commissioner, 248 F.2d 399, 406 (2d Cir. 1957), remanding T.C. Memo. 1956-137. If funds are advanced for a risky purpose, an inference may arise that the parties did not contemplate repayment in all events, and hence that the advance should not be treated as genuine debt. See PepsiCo Puerto Rico, Inc.,104 T.C.M. (CCH) at 344.

This factor overlaps the "thin capitalization" factor, which also addresses the risk that an advance will not be repaid. In both cases the same facts show that the risk here was quite low. Far from being devoted to a risky or speculative purpose, the CSE loan proceeds were ultimately used to repay petitioner's outstanding CP balance. By eliminating short-term commercial debt and replacing it with five-year intercompany debt, the transaction ultimately reduced the risk profile of the ITW worldwide group. This factor supports debt treatment.

**[\*48]**  13. <u>Identity of Interest Between Creditor and Shareholder</u>

If shareholders advance funds to their corporation ratably to their percentage ownership interests, an inference arises that the advances may be capital contributions rather than loans. <u>Estate of Mixon</u>, 464 F.2d at 409; <u>Monon R.R.</u>, 55 T.C. at 358. This factor has little meaning here because this is not a debt/equity case; the advances were made to the shareholder, not by the shareholder. As noted earlier, the fact that CSE was CSA's sole shareholder somewhat favors respondent, given the extent of shareholder control. <u>See</u> <u>supra</u> pp. 33-34. But we regard the "identity of interest" factor as essentially neutral here.

14. <u>Ability to Obtain Outside Loans</u>

In applying this factor we consider whether the purported borrower's financial condition was such that a third-party lender would have lent funds on substantially the same terms as did the related party. <u>See</u> <u>Geftman v. Commissioner</u>, 154 F.3d 61, 75-77 (3d Cir. 1998), <u>rev'g in part, vacating in part</u> T.C. Memo. 1996-447. A borrower's ability to secure a third-party loan to refinance the related-party loan similarly supports debt characterization. <u>See</u> <u>NA Gen. P'ship & Subs.</u>, 103 T.C.M. (CCH) at 1923; <u>Nestlé Holdings, Inc. v. Commissioner</u>, T.C. Memo. 1995-441, 70 T.C.M. (CCH) 682, 702, <u>vacated and remanded on another issue</u>, 152 F.3d 83 (2d Cir. 1998). "[T]he touchstone of economic reality is whether an

**[*49]** outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, 89 T.C. 816, 828 (1987). An advance that is "far more speculative than what an outsider would make * * * is obviously a loan in name only." Fin Hay Realty Co., 398 F.2d at 697; see Laidlaw Transp., Inc., 75 T.C.M. (CCH) at 2621, 2624 (finding advance to be equity where highly-leveraged borrower could not have borrowed full amount from an outside lender).

The evidence shows that CSE could easily have borrowed $356.8 million from an outside lender. Drs. Chambers and Shaked credibly testified that an outside lender would have evaluated CSE's creditworthiness by considering all of its assets, including the assets of its lower-tier operating subsidiaries. Dr. Shaked explained that the CSE group at the relevant times had an equity cushion of $6 billion to $7 billion, with very little outside debt. Respondent's experts, Mr. Grien and Dr. Hubbard, agreed with this assessment. CSE would likely have qualified for a S&P credit rating of at least BBB, which was investment grade. Mr. Chigas accordingly opined that, if CSE in 2006 had sought to borrow $356.8 million in the credit markets, investors would very likely have lent money to it on substantially the same terms as did CSA.

Respondent points out that the CSE note lacked standard covenants that would often appear in a bond sold to third-party investors. These might include

[*50] negative covenants restricting payment of dividends, requiring maintenance of working capital, restricting mergers and sales of assets, or restricting future issuance of senior debt. But for intercompany loans the absence of such provisions is not surprising. CSA would logically rely on ITW, its ultimate parent, to prevent CSE from taking steps that would endanger either company's financial integrity. As we have recognized previously, "certain credit protections are not as important in the related-party context," so that an intercompany loan "may understandably offer more flexible terms than could be obtained elsewhere." NA Gen. P'ship & Subs., 103 T.C.M. (CCH) at 1921, 1923.

In determining whether the purported borrower could have secured credit from third parties, "we do not apply a mechanical test of absolute identity between the related-party advances" and open-market credit transactions. Nestlé Holdings, Inc., 70 T.C.M. (CCH) at 703 (sustaining debt characterization despite absence of covenants requiring maintenance of working capital, restricting sales of assets, and restricting dividend payments). Rather, our objective is to determine whether an unrelated lender would have extended credit on substantially similar economic terms. See NA Gen. P'ship & Subs., 103 T.C.M. (CCH) at 1924 (sustaining debt

**[\*51]** characterization despite evidence that borrower would have paid an interest rate up to 100 basis points higher if it had borrowed in the credit markets).[17]

Mr. Chigas credibly testified that investment grade debt generally need not include financial covenants and that the addition of restrictive covenants like those discussed above would have had no material effect on investor perceptions. A third-party lender would have evaluated CSE's creditworthiness by considering its excellent capital structure, low debt profile, strong historical and projected earnings, and eligibility for an investment grade credit rating. Concluding as we do that a third-party lender would have extended credit to CSE on essentially the same economic terms as CSA did, we find that this last factor favors characterizing the advance as bona fide debt.

15.   Conclusion

Our determination as to whether the CSE loan constituted genuine indebtedness rather than a dividend does not depend on a mechanical counting of factors, but on evaluating the transaction as a whole. See Hardman, 827 F.2d at 1412.

---

[17]While mandating interest at a rate of 6%, the 2006 note did not require that CSE pay interest periodically. Petitioner's experts agreed that in this respect the CSE note differed from standard third-party debt. Mr. Chigas credibly testified that this interest-deferral option equated to a fairly minor benefit, in the range of 5 to 10 basis points. CSE in fact paid interest annually at the rates required by the 2006, 2011, and 2012 notes.

[*52] The ultimate question we must decide is "whether, at the time of the withdrawals, the taxpayer intended to repay them." Busch, 728 F.2d at 948. In making this determination we do not treat any single factor as dispositive. Frierdich, 925 F.2d at 182.

We have considered 14 factors in our analysis. Nine factors favor debt treatment, four seem neutral or unhelpful here, and only one factor favors dividend treatment. Several factors--evidence of the intent to repay, CSE's ability to repay, the existence of all conventional indicia of debt, and CSE's ability to borrow from third parties on similar economic terms--favor petitioner rather strongly. The one factor that favors respondent--CSE's status as CSA's sole shareholder--would exist in any holding-company structure and thus carries somewhat less weight here. Evaluating these factors and the transaction overall, we find that the CSE note constituted bona fide debt.

III.   Application of Judicial Doctrines

Respondent urges that we deploy one or more judicial anti-tax-avoidance doctrines to recharacterize the repatriation transaction as a dividend to petitioner or Paradym. Petitioner replies that, once the Court has applied the traditional debt-vs.-dividend analysis outlined above, the substance of the transaction is

[*53] established and cannot be recharacterized using common law theories.  As explained below, we agree with petitioner.[18]

### A.    Economic Substance Doctrine

Taxpayers may generally structure their business transactions in a manner that minimizes tax liability.  See Boulware v. United States, 552 U.S. 421, 429 n.7 (2008) (citing Gregory v. Helvering, 293 U.S. 465, 469 (1935)).  However, as has long been established, courts may look beyond the form of a transaction to its substance to determine how the transaction should be treated for tax purposes.  See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Grojean v. Commissioner, 248 F.3d 572, 574 (7th Cir. 2001), aff'g T.C. Memo. 1999-425.

The economic substance doctrine, as applied by most courts, has objective and subjective components.  The objective element considers whether a transaction meaningfully changes the taxpayer's economic position, and the subjective element considers whether the taxpayer has a valid nontax business purpose.  See Feldman v. Commissioner, 779 F.3d 448, 455 (7th Cir. 2015), aff'g T.C. Memo.

_____

[18]Petitioner contends that respondent bears the burden of proof on this issue because it is a "new matter * * * pleaded in the answer."  Rule 142(a)(1).  Respondent contends that, because the arguments discussed in the text do not require "different evidence" or increase the deficiency, he did not raise a new matter in his answer.  See Shea v. Commissioner, 112 T.C. 183, 197 (1999).  Because we decide this issue on a preponderance of the evidence, we need not decide who has the burden of proof.  See sec. 7491(a); Estate of Turner, 138 T.C. at 309.

[*54] 2011-297; Grojean, 248 F.3d at 574.  The Seventh Circuit has noted that, "even when a transaction has some degree of nontax economic substance, the substance-over-form principle may provide an independent justification for recharacterizing it." Feldman, 779 F.3d at 457.

We find both elements of the economic substance doctrine satisfied here. The economic reality of the transaction is that CSA made a loan to CSE, and CSE made a distribution to Paradym.  This pair of transactions meaningfully changed the parties' economic positions:  CSA now had a $356.8 million asset on its books, CSE was obligated to repay a $356.8 million liability with interest, and Paradym received a distribution that enabled petitioner to pay down its CP indebt-edness.  Because the transfer of funds from CSA to CSE was a loan in substance as well as in form, neither the economic substance doctrine nor the substance-over-form principle can be used to metamorphose the loan into a dividend.

Contrary to respondent's assertions, the intercompany nature of the transfers does not mean that the parties' economic positions did not change.  Respondent relies heavily on Dr. Hubbard's theory that CSA had an "implied liability" to fund repayment of the CSE note--a liability that supposedly offset the loan asset on its books--because CSE as a holding company lacked operating earnings of its own. We have rejected those arguments in concluding that the CSE loan was bona fide

[*55] debt.  See supra pp. 39-42 & n.16.  Those arguments do not become any more persuasive when tendered in support of an "economic substance" position.

We also find that the transaction was supported by a valid nontax business purpose.  As the Seventh Circuit has held, "[w]hether withdrawals by a shareholder from a corporation are treated for tax purposes as loans or dividends turns on whether * * * the taxpayer intended to repay them."  Busch, 728 F.2d at 948.  We have determined that CSE intended to repay the advance and that it was a loan.  Execution of that loan had a valid nontax business purpose:  securing funds for appropriate corporate use (here, paying down the parent's outstanding CP balance).  The fact that the parties used a debt transaction to fund this pay-down, instead of a dividend that may have been more costly tax-wise, does not imbue the transaction with an invalid purpose.  See Gregory, 293 U.S. at 469 ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.").  For all these reasons, we see no possible application of the economic substance doctrine on these facts.

B.    Step Transaction Doctrine

Under the step transaction doctrine formal steps in a transaction may be "disregarded for tax purposes if the taxpayer could have achieved its objective

[*56] more directly, but instead included the step for no other purpose than to avoid U.S. taxes." Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210, 213 (D.C. Cir. 2001), aff'g T.C. Memo. 1999-411; see Superior Trading, LLC v. Commissioner, 137 T.C. 70, 88-90 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013). As we explained in Smith v. Commissioner, 78 T.C. 350, 389 (1982):

> The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. * * *

The step transaction doctrine has no application here. Respondent contends that the advance by CSA to CSE and the distribution by CSE to Paradym were mutually interdependent steps that should be collapsed into a dividend from CSA to petitioner. But CSA could not have paid a dividend to Paradym or petitioner because neither was a shareholder of CSA; any distribution by CSA would first have to go to CSE, its parent corporation. In reality, respondent is not seeking to collapse unnecessary steps, but to recharacterize the first step as a dividend rather than a loan. We have rejected that argument for the reasons set forth above.[19]

---

[19]Respondent erroneously cites Barnes Grp., Inc. v. Commissioner, T.C. Memo. 2013-109, 105 T.C.M. (CCH) 1654, aff'd, 593 F. App'x 7 (2d Cir. 2014),

(continued...)

[*57] Both parties seek support for their positions from <u>Falkoff v. Commissioner</u>, 604 F.2d 1045 (7th Cir. 1979), <u>rev'g and remanding</u> T.C. Memo. 1977-93, 36 T.C.M. (CCH) 417.  In that case, a subsidiary corporation (S) planned to sell an appreciated asset and expected to recognize a large taxable gain.  Its parent corporation (P), which had no E&P at that point, obtained a loan from a third-party bank and used the loan proceeds to make a return-of-capital distribution to its parent, a partnership.  The partnership used those funds to repay its own loan to the same bank, in effect substituting P for itself as the bank's obligor.  S sold the appreciated asset three days later, but that sale closed in P's next taxable year.  S then used a portion of the sale proceeds to make a loan to P, which used those funds to repay the loan it had obtained from the bank.  <u>Id.</u> at 1047.

---

[19](...continued)
as support for his position.  The taxpayer there caused a CFC to transfer cash to a newly formed Bermuda entity in exchange for stock.  That cash was then transferred to a newly formed Delaware corporation in exchange for stock, and the Delaware corporation purportedly lent the cash to the U.S. parent.  We ruled for the Commissioner, finding that the separate steps in this transaction should be collapsed and that the cash transferred by the CFC was in substance a dividend by it to the U.S. parent.  <u>Id.</u> at 1667.  Our holding was based on the taxpayer's failure to respect the formalities of its own transactions, in particular the failure by the U.S. parent to pay interest to the Delaware corporation.  <u>Ibid.</u>  Here, by contrast, the formalities of the transaction were uniformly respected and were consistent with the substance, viz., the execution of a loan from CSA to CSE.  And whereas the CFC in <u>Barnes Grp.</u> could have paid a dividend directly to its U.S. parent as the first (and only) step of the transaction, CSA could not have paid a dividend directly to Paradym because Paradym did not own any CSA stock.

[*58] The taxpayer treated these transactions as a loan followed by a return-of-capital distribution in P's first taxable year, which resulted in no taxable income to the partnership. The Commissioner challenged this treatment under the step transaction doctrine, contending that all of the steps should be collapsed and be deemed to have occurred in P's second taxable year, concurrently with the asset sale. In that event, the E&P generated by the asset sale would "tier up" to P, the intercompany loan would disappear, and P's distribution to the partnership would be a taxable dividend rather than a tax-free return of capital.

The Seventh Circuit, reversing this Court, held that the separate steps of the transaction should be respected and that "[t]he transaction, viewed as a whole, did have economic substance." Id. at 1050. It viewed Falkoff as "a case where a corporation without accrued or present earnings and profits borrowed against its own appreciated assets and made a distribution in anticipation of future profits." Ibid. "[S]uch a distribution," the court held, "does not result in taxable income to the shareholder." Ibid.

This Court in Falkoff had concluded that the partnership, rather than P, was the true obligor on the bank loan; that the partnership had provided P with the funds to make the distribution in year one; that the year-one distribution involved a circular flow of funds and hence lacked economic substance; and that the rele-

[*59] vant distribution occurred after the asset sale in year two, when P--now flush with E&P--issued a constructive dividend to the partnership by repaying the bank loan. See Falkoff, 36 T.C.M. (CCH) at 422-423. The Seventh Circuit rejected that analysis, concluding that P was the true obligor on the bank loan and that the distributee partnership had not "provided funds enabling the corporation to make a sham distribution" back to itself. Falkoff, 604 F.2d at 1050. But even if the bank loans were thought to be shams, the Seventh Circuit held that the relevant taxable event--the year-one distribution--occurred in a taxable year in which P had no E&P. Thus, "no taxable income would be due in any event." Id. at 1051.

Although there are factual differences between Falkoff and the instant case, we think Falkoff helps petitioner much more than it helps respondent. The basic transaction in both cases is the same: A corporation without accrued or current E&P (here, CSE) borrowed against its appreciated assets and made a return-of-capital distribution to its parent (here, Paradym) in anticipation of future profits (here, earnings expected from CSA's operating subsidiaries). See id. at 1050.

The main factual difference is that CSE borrowed from an affiliate, whereas P, the distributing corporation in Falkoff, borrowed from a third-party bank. But this factual difference requires, not that we collapse the transactions, but simply that we subject them to greater scrutiny, i.e., determine whether the CSE loan was

**[\*60]** a true loan. Having determined that it was a true loan, we regard it as functionally equivalent to a bank loan. That being so, the basic facts of Falkoff are essentially similar to those here.[20]

The Seventh Circuit unambiguously rejected the Commissioner's application of the step transaction doctrine to these facts. Indeed, it noted that our Court had also "rejected, at least in part, the Commissioner's step transaction approach." Id. at 1047. In Falkoff we observed that P, the distributing corporation, "had every right to pay a dividend out of borrowed funds in the taxable year ending September 30, 1969, in anticipation of the realization of gain which would cover that distribution in the subsequent year." Falkoff, 36 T.C.M. (CCH) at 422 (citing Gross v. Commissioner, 23 T.C. 756 (1955), aff'd, 236 F.2d 612 (2d Cir. 1956)). That observation is not helpful to respondent in this case. We ruled for the Commissioner in Falkoff on a different theory, namely, that the distributee partnership ra-

---

[20]Another factual difference is that the transactions in Falkoff were split between two tax years, whereas the key transactions here all occurred during 2006. The split between two tax years, however, was relevant only to the Seventh Circuit's alternative holding, under which it would have sustained the taxpayer's position even if the bank loans were thought to be shams. See Falkoff, 604 F.2d at 1050. The split between two tax years had no bearing on the Seventh Circuit's primary holding as set forth in the text. Respondent also notes that the parties in Falkoff were domestic corporations, whereas CSA and CSE were CFCs. This distinction relates to respondent's "Subpart F avoidance" theory, which we discuss below. See infra pp. 62-64.

[*61] ther than the distributing corporation was the true obligor on the bank loan. That argument is not available to respondent here.

In sum, we are unpersuaded by respondent's invocation of the step transaction doctrine on the facts presented here. The Seventh Circuit in Falkoff clearly rejected application of that doctrine. And the facts of this case are similar, in all critical respects, to the facts of Falkoff.

C.    Conduit Doctrine

Contending that CSE served no purpose in the repatriation transaction, respondent invokes a conduit theory to reach the same bottom line as his step transaction theory, namely, that CSA in substance paid a dividend directly to Paradym out of CSA's accumulated E&P. Under the conduit doctrine, a court may disregard an entity if it functions as a mere conduit in implementing a prearranged transaction. See Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Alphaco, Inc. v. Nelson, 385 F.2d 244, 245-246 (7th Cir. 1967). In Court Holding Co., a corporation made a liquidating distribution of appreciated property to its shareholders, who immediately sold the property to a buyer in a transaction that the corporation had arranged in advance. The Supreme Court held that the corporation in reality had effected the sale and that the shareholders were mere conduits employed in an effort to have the asset sale taxed at lower rates.

**[\*62]** We reject respondent's conduit theory for the same reasons we have rejected his step transaction theory. CSA could not have paid a dividend directly to Paradym because Paradym owned no CSA stock. See supra p. 56. Because CSE owned 100% of CSA's stock, respondent errs in asserting that CSE "served no purpose" in the transaction. And CSE cannot be regarded as a conduit for the transmission of a dividend from CSA through it to Paradym because (as we have held) the transfer from CSA to CSE was not a dividend but was a loan.

D.    "Subpart F Avoidance"

Respondent contends that petitioner should not be allowed to repatriate the earnings of its foreign subsidiaries and yet avoid U.S. income taxation under subpart F. According to respondent, it would "thwart the policies underlying the international tax provisions" to permit a permanent repatriation of foreign earnings without taxation. Allowing petitioner to repatriate funds in this manner would produce (in respondent's view) a disparate outcome compared to a similarly situated domestic shareholder that received a loan from a foreign subsidiary. See sec. 956(a), (c)(1)(C) (requiring subpart F inclusion where CFC makes an investment in "United States property," defined to include "an obligation of a United States person").

**[\*63]** As petitioner correctly notes, neither section 951 nor section 956 applies to the transactions at issue. The characterization of CSA's advance to CSE is governed by familiar debt-vs.-dividend principles, which apply alike to foreign and to domestic corporations. See, e.g., Taiyo Hawaii Co., Ltd. v. Commissioner, 108 T.C. 590, 601-603 (1997). And the distribution by CSE to Paradym is governed entirely by section 301, which does not by itself implicate any international tax concerns. Respondent appears to contend that the policies underlying the Subpart F regime require us to recharacterize these transactions in an extraordinary way. We decline respondent's invitation in the absence of a clear statutory directive supporting his position.[21]

Respondent seeks to distinguish Falkoff along similar lines, noting that the entities involved there were domestic corporations as opposed to CFCs. But the Commissioner advanced a similar policy argument in Falkoff, and the Seventh Circuit rejected it:

> The Commissioner, of course, has argued that to reverse the Tax Court's judgment would permit taxpayers to determine for

---

[21]In his amended answer respondent contended that CSA's loan to CSE should be recharacterized as a loan directly to petitioner or one of its domestic subsidiaries, yielding an investment in U.S. property under section 956. At trial respondent abandoned this argument because the purported investment (if the Court were to find it such) would have been made during CSA's FYE November 30, 2007, and thus could not have affected petitioner's tax liability for 2006.

**[*64]** themselves the time and manner of taxation, in frustration of Congressional directive and with prejudice to the federal fisc. We think our decision will have no such dire consequence. * * * We believe the taxpayers here did no more than use the[] characteristics of the tax system to their best advantage. The situation here is an unusual one--a corporation without accrued or current earnings and profits but with substantial assets against which it can borrow to make a cash distribution to its shareholders. Yet, even here the effect is only to delay, not escape, taxation. * * * The Corporation's future earnings and profits will be taxed as dividends when distributed. [Falkoff, 604 F.2d at 1051-1052].

Respondent replies that we should be less sanguine about future distributions of profits where CFCs are involved. Profits may be held offshore indefinitely, respondent notes, and E&P do not "tier up" to a foreign holding company as they do inside a U.S. consolidated group. But "[i]f the draftsman's handiwork fell short of fully accomplishing the objectives sought, it must be left to Congress to repair such shortfall." Ludwig v. Commissioner, 68 T.C. 979, 991-992 (1977).[22]

---

[22]On four occasions the Treasury Department has proposed changing the law to reduce taxpayers' ability to use leveraged distributions to effect repatriations of foreign earnings. See Department of the Treasury, General Explanations of the Administration's Fiscal Year 2016 Revenue Proposals 119-121 (February 2015); General Explanations of the Administration's Fiscal Year 2015 Revenue Proposals 55 (March 2014); General Explanations of the Administration's Fiscal Year 2014 Revenue Proposals 59 (April 2013); General Explanations of the Administration's Fiscal Year 2013 Revenue Proposals 98 (February 2012). Congress did not enact any of these proposals.

**[\*65]** IV.     Tax Consequences of Distribution

In December 2006 CSE distributed $356,778,000 to Paradym, a member of petitioner's U.S. consolidated group.  Section 301(c)(1) provides that the portion of a distribution "which is a dividend (as defined in section 316) shall be included in gross income."  Section 316(a) provides that "the term 'dividend' means any distribution of property made by a corporation to its shareholders" out of current E&P or out of E&P "accumulated after February 28, 1913."  The parties agree that CSE had no current or accumulated E&P for the year in which it made the distribution to Paradym.  Thus, no portion of the distribution was a dividend.

Section 301(c)(2) provides that the portion of a distribution which is not a dividend "shall be applied against and reduce the adjusted basis of the stock."  Section 301(c)(3) provides that the portion of a distribution which is not a dividend, "to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property."  Paradym owned 100% of CSE's stock, and these provisions require that we determine its basis in that stock.

A.     Todd Miller Report

The taxpayer generally bears the burden of substantiating its basis in property.  See O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), aff'g T.C. Memo. 1957-193.  With a view to discharging that burden, petitioner offered at

[*66] trial the expert testimony of Todd Miller, who performed a detailed basis study for this purpose. Mr. Miller is a partner in the transaction advisory services practice of Ernst & Young (EY). He has performed more than 50 basis studies during his career, and he formerly headed the EY group that specializes in this field.

Petitioner contends that Mr. Miller should be qualified as an expert because he provided specialized knowledge in the area of basis calculation. Respondent contends that Mr. Miller should be treated at most as a summary witness, whose summary of transactions underlying Paradym's basis in CSE might be useful to the Court. Having reserved ruling on this at issue at trial, we now express our agreement with respondent.

Rule 702 of the Federal Rules of Evidence defines an expert witness as one who is "qualified as an expert by knowledge, skill, experience, training, or education." An expert witness may testify in the form of an opinion if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence." Id. para. (a); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). A lay witness may not offer an expert opinion. See Fed. R. Evid. 701.

**[\*67]** This Court regularly hears testimony from IRS revenue agents who describe the methodology they employed--e.g., the bank deposits method or the net worth method--to reconstruct a taxpayer's unreported income. We have generally treated such witnesses as summary witnesses, not experts, reasoning that they are not providing an opinion based on scientific, technical, or other specialized knowledge. See, e.g., Worth v. Commissioner, T.C. Memo. 2014-232, 108 T.C.M. (CCH) 522, 528 (citing Gudenschwager v. Commissioner, T.C. Memo. 1989-6, 56 T.C.M. (CCH) 1010, 1012)), aff'd, 666 F. App'x 692 (9th Cir. 2016). Like an IRS revenue agent, Mr. Miller testified as to the data he collected, the observations he made about those data, and the methodology he followed in calculating Paradym's basis. See Worth, 108 T.C.M. (CCH) at 529 (holding that revenue agent's testimony "would be accepted, not for the purpose of demonstrating the correctness of her methodology, but solely for the purpose of explaining what she did").

Mr. Miller's methodology required him to characterize certain transactions as taxable or tax-deferred. In doing this he was not offering a legal opinion as to the appropriate tax treatment of these transactions. Rather, he was performing a "mechanical sorting of entries" to compile and characterize the voluminous transactions by which Paradym acquired basis in CSE. See, e.g., United States v. Stierhoff, 549 F.3d 19, 28 (1st Cir. 2008) ("The key to admissibility is that the sum-

**[\*68]** mary witness's testimony does no more than analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts."). Other courts have held that a lay witness may offer tax-related calculations if they are "straightforward and transparent." See, e.g., United States v. Diez, 515 F.2d 892, 905 (5th Cir. 1975).[23]

Although Mr. Miller's testimony fell outside the scope of rule 702, he was competent to testify under rule 1006 of the Federal Rules of Evidence as a summary witness to explain how he performed his basis study. The latter Rule permits the use of "a summary, chart, or calculation to prove the content of voluminous writings * * * that cannot be conveniently examined in court," provided that the underlying information was disclosed to the opposing party. Respondent agrees that the records underlying Mr. Miller's basis study were properly disclosed to him. We conclude that Mr. Miller appropriately testified as a summary witness to

---

[23]We are unpersuaded by petitioner's contention that Mr. Miller's analysis was akin to a forensic accountant's. Although both types of witnesses rely on books and records to make their determinations, forensic accountants go beyond sorting book entries and may apply specialized knowledge to determine whether a taxpayer has engaged in fraudulent activity. See WWP, Inc. v. Wounded Warriors Family Support, Inc., 628 F.3d 1032, 1039-1040 (8th Cir. 2011).

**[*69]** summarize otherwise admissible data, and his testimony has been admitted into evidence for that purpose.[24]

## B.    Basis Substantiation

Mr. Miller relied on a variety of business records to document the transactions relevant in determining Paradym's basis in CSE.  These records included (among other things) third-party purchase agreements, intercompany purchase agreements, section 338 elections, and third-party valuation reports.  Using these records, he found 34 distinct transactions, occurring between March 2001 and September 2006, that generated basis in CSE.  Most of these transactions were contributions by entities within the ITW Group; Mr. Miller noted that certain of these transactions resulted in carryover basis rather than basis determined by the current fair market value of property.  After performing his analysis, Mr. Miller concluded that Paradym's basis in CSE exceeded $1.5 billion, more than four times the amount needed to cover CSE's distribution of $356,778,000.

Respondent contends that petitioner has failed to substantiate Paradym's basis in CSE because:  (1) petitioner did not provide complete business records to

---

[24]To the extent respondent contends that the documents on which Mr. Miller relied to determine Paradym's basis constituted inadmissible hearsay, we reject that argument.  All of Mr. Miller's determinations were linked to documents and data that were admitted or would be admissible into evidence, and he properly testified about how he used those documents to calculate Paradym's basis.

**[\*70]** Mr. Miller; (2) petitioner's tax returns, standing alone, cannot substantiate Paradym's basis; and (3) certain distributions were improperly reflected on information returns, which allegedly caused Mr. Miller's basis calculations to be inflated. At trial James Batory, a senior revenue agent in the IRS Large Business and International Division, testified that he was unable to determine Paradym's basis in CSE because petitioner submitted inconsistent documentation to him and because he had difficulty tracking basis-generating transactions. On account of these supposed difficulties, he determined Paradym's basis in CSE to be zero.

We find that petitioner has adequately substantiated basis of at least $356,778,000. Contrary to respondent's view, Mr. Miller relied on comprehensive and reliable business records to determine basis. We need not parse each transaction he analyzed because we find that three of the transactions generated basis of $393.2 million, which is sufficient to cover the distribution at issue:

• In September 2001 Premark FEG (Premark), then CSE's sole shareholder, made a $39.9 million capital contribution to CSE. This contribution was made in cash. The record establishes that this transaction was properly treated as a section 351 contribution and recorded as such on all relevant books and records maintained by the ITW Group.

**[\*71]** • In October 2001 Premark made a $15.8 million capital contribution to CSE. This contribution took the form of a note issued by another ITW entity, with CSE issuing shares in exchange for receiving the note with a carryover basis. The record establishes that this transaction was properly treated as a section 351 contribution and recorded as such on all relevant books and records maintained by the ITW Group.

• In September 2003 InHold, then CSE's sole shareholder, contributed to CSE a $337.5 million credit facility that it had purchased from petitioner. CSE issued shares in exchange for receiving this credit facility with a carryover basis. The record establishes that this transaction was properly treated as a section 351 contribution and recorded as such on all relevant books and records maintained by the ITW Group.

Taken together, these three transactions establish basis of $393.2 million in CSE. Under the principle set forth in Johnson v. United States, 435 F.2d 1257 (4th Cir. 1971), petitioner was required to apply the distribution to Paradym on a pro rata basis across each block of CSE stock. In his analysis Mr. Miller concluded that CSE had 16 blocks of stock. He further concluded that each block of stock had more than enough basis to absorb a return-of-capital distribution. We find this analysis to be correct.

**[\*72]** Respondent contends that petitioner's tax returns and related workpapers are unreliable sources to verify basis, but he does not point to any specific defects in these documents. Although he asserts that petitioner has failed to provide sufficient documentation, both parties stipulated all of the documents on which Mr. Miller relied. Mr. Miller credibly testified that he went well beyond petitioner's tax returns to determine basis, consulting the ITW Group's corporate records for numerous transactions. And he explained that he made conservative assumptions --viz, assumptions against petitioner's interest--in several instances where he was not entirely sure how to characterize a particular transaction.

Even if petitioner's documentation were deemed inadequate in certain respects, the parties agree that we may apply the Cohan rule to estimate basis. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930); Shank v. Commissioner, T.C. Memo. 2018-33, at \*6-\*7 (applying the Cohan rule to estimate basis in stock); Kerr v. Commissioner, T.C. Memo. 1990-155 (same); cf. Ternovsky v. Commissioner, 66 T.C. 695, 698 (1976) (applying similar principles to determine basis in other property); Alameda Realty Corp. v. Commissioner, 42 T.C. 273, 283 (1964); Huzella v. Commissioner, T.C. Memo. 2017-210, at \*7-\*9; Wheeler v. Commissioner, T.C. Memo. 2014-204, 108 T.C.M. (CCH) 388, 390. Were we to

**[*73]** apply the <u>Cohan</u> rule, we would find that petitioner has adequately substantiated that Paradym's basis in CSE was at least $356,778,000.

In sum, we find that Paradym had sufficient basis in CSE to treat the entire $356,778,000 distribution as a nontaxable return of capital under section 301(c)(2). Having determined that petitioner is not liable for any deficiency for 2006, we find that it is not liable for any accuracy-related penalty under section 6662 for that year. To reflect the foregoing,

<u>Decision will be entered for</u>

<u>petitioner</u>.

**[\*74]** APPENDIX

Petitioner's Expert Witnesses

1.      William Chambers:  Dr. Chambers earned his B.A. in history and economics from the College of Wooster and his M.A. in philosophy and Ph.D. in economics from Columbia University.  Currently he is an associate professor emeritus of finance at Boston University Metropolitan College.  He has substantial experience as a debt ratings analyst, having rated hundreds of companies' debt issuances. He previously worked as a debt analyst and a corporate ratings and risk solutions executive for S&P for 23 years.

2.      Charles Chigas:  Mr. Chigas earned his B.A. in economics from Tufts University and his M.B.A. from Amos Tuck School.  Currently he is the head of the debt capital markets group at Natixis Securities America and the managing partner of Orea Thea Advisory, a consulting firm.  He has worked in the debt capital area for almost 30 years, during which time he has been involved with thousands of corporate bond transactions.

3.      Saul Froomkin:  Mr. Froomkin earned his LL.B. and LL.M. from the University of Manitoba Law School.  He is currently serving as Queen's Counsel in Bermuda, is an Officer of the Most Excellent Order in the British Empire, and is a justice of the peace and fellow for the Society of Advanced Legal Studies.  Previously, he served as the Solicitor General of Bermuda from 1978 to 1981, where he was senior counsel to the Government on civil and criminal matters.  He also served as attorney general of Bermuda from 1981 to 1991.

4.      Israel Shaked:  Dr. Shaked earned his B.A. in economics, B.A. in statistics, M.B.A. in finance, and a Ph.D. in business administration finance from Harvard University.  Currently he is a finance and economics professor at Boston University School of Management and a managing director of Michel-Shaked Group where he works as a corporate adviser and litigation consultant.  He has published extensively in the area of corporate finance and valuation and serves on the board of the American Bankruptcy Institute Journal.

**[\*75]** <u>Respondent's Expert Witnesses</u>

      1.     Robert C. Grien:  Mr. Grien earned his B.A. in political science from Tulane University and his M.B.A. with a concentration in finance from Columbia University.  Mr. Grien is currently the managing director and head of the finance restructuring practice at TM Capital Corp., an investment banking firm.

      2.     R. Glenn Hubbard:  Dr. Hubbard is a professor of economics and finance and Dean of the Graduate School of Business at Columbia University.  He earned his B.A. and B.S. degrees from Central College of Florida and his M.A. and Ph.D. in economics from Harvard University.  He has authored three tax textbooks, published articles in numerous peer-reviewed journals, has served on several journal editorial boards, and was previously a member of the Council of Economic Advisers.